## Case No. 14,692a.

### UNITED STATES v. BURR.[1]

[Coombs' Trial of Aaron Burr, 1; 4 Cranch (8 U. S.) 455.]

Circuit Court, D. Virginia. April 1, 1807.

TREASON—WHAT CONSTITUTES—PRELIMINARY EXAMINATION—SUFFICIENCY OF EVIDENCE —PROBABLE CAUSE.

[1. On a preliminary examination probable cause must be shown. Proof furnishing good reason to believe that the crime alleged has been committed by the person charged, though not

---

1 [This and the following cases (Cases Nos. 14,-692b–14,694a) arising out of the trials of Aaron Burr, have been taken from the report by J. J. Coombs, Esq., published in 1864, rather than from the more voluminous and less readable reports of Carpenter & Robertson, published early in the century. In order to render more accessible the various opinions delivered by the chief justice, separate reports of the proceedings arising out of the commitments and trials have been made, while the proceedings from day to day, out of which the various motions arose, and the running comments of court and counsel, are shown in the main case, No. 14,693. The entire matter is thus comprehended in 10 separate reports, which, beginning with the above case, No. 14,692a, are printed in consecutive order in this volume. The proceedings were commenced March 20, 1807, by bringing the prisoner before Chief Justice Marshall as a committing magistrate, for preliminary examination. On the proofs then adduced, the chief justice refused to hold Burr to answer to the charge of high treason, but committed him on the charge of a

sufficient for a conviction, will suffice for commitment.]

[Cited in Re Van Campen, Case No. 16,835: Re Farez, Id. 4,645.]

[2. An affidavit, used on a preliminary examination of a person charged with setting on foot a military expedition against a nation with which the United States were at peace, set out the translation of a letter originally written in cipher to the affiant, and signed with the name of the accused, describing a military enterprise, from which it appeared that the means had been provided. The affidavit averred that the letter was received from the accused, but did not aver that it was in his handwriting, nor set out a copy of the original and the cypher. *Held* that, taken in connection with previous declarations of the accused, showing a meditated expedition against Spanish dominions, it made out a case of probable cause.]

[Cited in U. S v. Bloomgart, Case No. 14,612.]

[3. An intention to commit treason against the United States by levying war, not carried out by the actual assembling of troops, is not punishable as treason.]

[4. The act of revolutionizing a territory of the United States, though only as a means for an expedition against a foreign power, is treason.]

[5. The engaging or enlisting of men for levying war against the United States, not followed by a future embodying of such men, is not punishable as treason.]

[6. A person will not be held to trial for treason in levying war against the United States on an affidavit that he is engaging or enlisting men for such purpose, without proof of the actual embodying of men, where ample time is given to get such proof.]

[At law. On examination of Aaron Burr for commitment. Aaron Burr was arrested by Maj. Perkins on the Tombigbee river in what is now Washington county, Ala., February 20, 1807. He was conducted to Ft. Stoddard, detained a prisoner there about two weeks, and then started for Washington City on horseback, attended by a guard of nine men, under the command of Maj. Perkins. At Fredericksburg, Va., Maj. Perkins was met by a dispatch from the president directing him to convey the prisoner to Richmond, Va., which he accordingly did.]

On Monday, March 30, 1807, Colonel Aaron Burr, who had remained under military guard in the city of Richmond since his arrival on the 26th of that month, was delivered over to the civil authorities by virtue of a warrant issued by the chief justice of the United States, founded on charges of a high misdemeanor, in preparing and setting

---

misdemeanor, in preparing and setting on foot a military expedition against the dominions or territory of a prince (the king of Spain) with whom the United States were at peace. (See above, Case No. 14,692a.) On May 25, 1807, the grand jury being then in session to consider the charges against Burr and his confederates, the attorney for the United States made a motion in open court to commit Mr. Burr on a charge of high treason, stating that additional evidence, not available at the time of the former hearing would be presented. Objection being made to the power of the court to undertake a further investigation, particularly while the grand jury was in session, the matter was argued at length, and on May 26th, the court rendered an opinion sustaining its power in the premises. Case No. 14,692b. Evidence was then heard upon this motion. Among the proofs offered was an affidavit by Jacob Dunbaugh, which was objected to on various grounds. The objections were argued, and on May 28th an opinion was delivered excluding the affidavit for want of proper authentication. Case No. 14,692c. On June 9th Mr. Burr applied to the court for a subpoena duces tecum to be directed to the president of the United States, requiring him to produce a certain letter and certain orders issued to the army and navy in relation to Burr's expedition. This motion having been fully argued, the court, on June 13th, rendered an opinion deciding that the writ might issue. Case No. 14,692d. Afterwards a witness called to prove the authenticity and materiality of a letter in cipher, which the attorney for the United States proposed to send up to the grand jury, refused to testify, on the ground that his answers might criminate himself; and the question of his right to decline answering the questions put to him was determined by the court, in an opinion delivered on the 18th of June. Case No. 14,692e. A motion was subsequently made by the defendant to attach Gen. Wilkinson for a contempt of court, in obstructing the administration of justice and abusing the process of the law, by coercing and intimidating certain witnesses, and procuring their depositions by unlawful means. Upon this motion evidence was received and argument had, and the court, in an opinion delivered on June 27th, refused the attachment. Case No. 14,692f. In selecting the petit jury certain questions arose as to what constitutes such prejudice or

partiality as will disqualify a juror; and on August 11th an opinion was delivered, considering the subject at length. Case No. 14,692g. The introduction of evidence was begun August 17th; and an objection was immediately made by the defense to the testimony of the first witness, Gen. Eaton, on the ground that the prosecution must first prove the overt act, as laid; before giving evidence of the intention and purposes of Burr in preparing the expedition. The question thus raised was determined by the court in an opinion delivered on the following day. Case No. 14,692h. The next case, No. 14,693, is the main case, comprising a report of all the proceedings in extenso (except those which have been made the subject of separate reports as herein indicated), together with the running comments of counsel thereon; also, the arguments of counsel and the opinion of the court upon the main question in the case, which was raised by defendant's motion to exclude further testimony on the grounds (1) that the evidence in relation to the overt act did not show a levying of war; and (2) that, it appearing that defendant was not present at the time, no evidence was admissible to connect him with the doings of the persons who had assembled for the purposes of the expedition. This motion was granted, and the case was thereupon committed to the jury, and a verdict of acquittal returned. Burr was immediately afterwards put upon his trial for a misdemeanor in setting on foot a military expedition against the dominions of the king of Spain. This trial also resulted in an acquittal. The proceedings therein are reported at length in Case No. 14,694. As a result of Burr's trials, a nolle prosequi was entered in respect to each of the indictments against his confederates, Harman, Blennerhassett, and Israel Smith. Afterwards a motion was made to commit all three of the prisoners "to that place for trial where the military expedition is said to have been completed." This motion was argued, and the chief justice, after delivering an opinion of some length, committed Burr and Blennerhassett to the district of Ohio, to be there held to answer the charge of setting on foot a military expedition against the dominions of the king of Spain. Case No. 14,694a. The defendants thereupon gave bail in the sum of $3,000 each, but it does not appear that any further steps were ever taken to bring them to trial in Ohio.]

on foot within the territories of the United States, a military expedition against the dominions of the king of Spain; and also of treason against the United States, in assembling an armed force with a design to seize the city of New Orleans, to revolutionize the territory attached thereto, and to separate the Western from the Atlantic states. Colonel Burr was conducted by the marshal of the district of Virginia, from his lodgings in the Eagle Hotel, to a retired room in the same house, before Chief Justice Marshall, for examination. The counsel and a witness for the United States, the counsel for the prisoner, and a few friends invited by the latter, were alone admitted. Before the examination commenced it was agreed between the counsel, with the assent of the Chief Justice, that if a discussion should become necessary an adjournment to the capitol should take place. The evidence introduced on behalf of the United States consisted of a copy of the record in the Cases of Bollman and Swartwout, in the supreme court of the United States, (containing the affidavits of General Eaton, General Wilkinson and others,) and also the verbal testimony of Maj. Perkins, who apprehended Colonel Burr in the Mississippi territory, giving an account of his arrest and conveyance to Richmond.

[The depositions were as follows:]

2 [Deposition of James Wilkinson:

[I, James Wilkinson, brigadier general and commander in chief of the army of the United States, to warrant the arrest of Doctor Erick Bollman, on a charge of treason, misprision of treason, or such other offense against the government and laws of the United States as the following facts may legally charge him with, on my honor as a soldier; and on the Holy Evangelists of Almighty God, do declare and swear, that on the sixth day of November last, when in command at Natchitoches, I received by the hands of a Frenchman, a stranger to me, a letter from Doctor Erick Bollman, of which the following is a correct copy:

["New Orleans, September 27, 1806.

["Sir: I have the honor to forward to your excellency the enclosed letters, which I was charged to deliver to you by our mutual friend. I shall remain for some time at this place, and should be glad to learn where and when I may have the pleasure of an interview with you. Have the goodness to inform me of it, and please to direct your letter to me, care of or enclose it under cover to them. I have the honor to be, with great respect, sir, your excellency's most obedient servant.

["(Signed)　　　　　Erick Bollman.
["Gen. Wilkinson."

[Covering a communication in cipher from Col. Aaron Burr, of which the following is

2 [From 4 Cranch (8 U. S.) 455.]

substantially as fair an interpretation as I have heretofore been able to make, the original of which I hold in my possession:

["I (Aaron Burr) have obtained funds, and have actually commenced the enterprise. Detachments from different points, and under different pretences, will rendezvous on the Ohio, 1st November. Everything internal and external favors views; protection of England is secured. Truxton is gone to Jamaica to arrange with the admiral of that station, and will meet at the Mississippi—England—navy of the United States are ready to join, and final orders are given to my friends and followers. It will be a host of choice spirits. Wilkinson shall be second to Burr only. Wilkinson shall dictate the rank and promotion of his officers. Burr will proceed westward 1st August, never to return. With him goes his daughter. The husband will follow in October with a corps of worthies. Send forthwith an intelligent and confidential friend, with whom Burr may confer. He shall return immediately with further interesting details. This is essential to concert and harmony of movement. Send a list of all persons known to Wilkinson west of the mountains, who could be useful, with a note delineating their characters. By your messenger send me four or five of the commissions of your officers, which you can borrow under any pretence you please. They shall be returned faithfully. Already are orders to the contractor given to forward six months' provisions to points Wilkinson may name. This shall not be used until the last moment, and then under proper injunctions. The project is brought to the point so long desired. Burr guarantees the result with his life and honor, the lives, the honor and fortunes of hundreds, the best blood of our country. Burr's plan of operations is to move down rapidly from the falls on the fifteenth of November, with the first five hundred or one thousand men, in light boats, now constructing for that purpose; to be at Natchez between the fifth and fifteenth of December; then to meet Wilkinson; then to determine whether it will be expedient, in the first instance, to seize on, or pass by, Baton Rouge. On receipt of this send Burr an answer. Draw on Burr for all expenses, etc. The people of the country to which we are going are prepared to receive us. Their agents now with Burr say that if we will protect their religion, and will not subject them to a foreign power, that in three weeks all will be settled. The gods invite to glory and fortune. It remains to be seen whether we deserve the boon. The bearer of this goes express to you. He will hand a formal letter of introduction to you from Burr, a copy of which is hereunto subjoined. He is a man of inviolable honor and perfect discretion; formed to execute rather than to project; capable of relating facts with fidelity, and incapable of relating them otherwise. He is thoroughly informed of the

plans and intentions of ——, and will disclose to you as far as you inquire, and no further. He has imbibed a reverence for your character, and may be embarrassed in your presence. Put him at ease and he will satisfy you. Doctor Bollman, equally confidential, better informed on the subject, and more intelligent, will hand this duplicate. 29th July."

[The day after my arrival at this city, the 26th of November last, I received another letter from the doctor, of which the following is a correct copy:

["New Orleans, November 25th, 1806.

["Sir: Your letter of the 16th inst. has been duly received. Supposing that you will be much engaged this morning, I defer waiting on your excellency till you will be pleased to inform me of the time when it will be convenient for you to see me. I remain with great respect, your excellency's most obedient servant,

    ["Erick Bollman.

["His Excellency, Gen. Wilkinson. Fauxbourg, Marigny, the house between Madame Trevigne and M. Macarty."

[On the 30th of the same month I waited in person on Doctor E. Bollman, when he informed me that he had not heard from Colonel Burr since his arrival here, that he (the said Doctor E. Bollman) had sent despatches to Colonel Burr by a Lieutenant Spence, of the navy, and that he had been advised of Spence's arrival at Nashville in the state of Tennessee, and observed that Colonel Burr had proceeded too far to retreat; that he (Colonel Burr) had numerous and powerful friends in the United States, who stood pledged to support him with their fortunes, and that he must succeed; that he (the said Doctor E. Bollman) had written to Colonel Burr on the subject of provisions; and that he expected a supply would be sent from New York, and also from Norfolk, where Colonel Burr had strong connections. I did not see or hear from the doctor again until the 5th inst., when I called on him the second time. The mail having arrived the day before, I asked him whether he had received any intelligence from Colonel Burr. He informed me that he had seen a letter from Colonel Burr of the 30th October, in which he (Colonel Burr) gave assurances that he should be at Natchez with 2,000 men on the 20th December, inst., where he should wait until he heard from this place; that he would be followed by 4,000 men more; and that he (Colonel Burr,) if he had chosen, could have raised or got 12,000 as easily as 6,000, but that he did not think that number necessary. Confiding fully in this information, I became indifferent about further disguise. I then told the doctor that I should most certainly oppose Colonel Burr if he came this way. He replied that they must come here for equipments and shipping, and

observed that he did not know what had passed between Colonel Burr and myself, obliqued at a sham defence, and waived the subject. From the documents in my possession, and the several communications, verbal as well as written, from the said Doctor Erick Bollman, on this subject, I feel no hesitation in declaring under the solemn obligation of an oath, that he has committed misprision of treason against the government of the United States.

    [(Signed)      James Wilkinson.

[Signed and sworn to this 14th day of December, 1806, before me one of the justices of the peace of this county.

    [(Signed)      J. Carrick.

    ["Philadelphia, July 25, 1806.

["Dear Sir: Mr. Swartwout, the brother of Colonel S., of New York, being on his way down the Mississippi, and presuming that he may pass you at some post on the river, has requested of me a letter of introduction, which I give with pleasure, as he is a most amiable young man, and highly respectable from his character and connections. I pray you to afford him any friendly offices which his situation may require, and beg you to pardon the trouble which this may give you. With entire respect, your friend and obedient servant,

    ["A. Burr.

["His Excellency, Gen. Wilkinson."

[Second deposition of James Wilkinson:

[I, James Wilkinson, brigadier general and commander in chief of the army of the United States, to warrant the arrest of Samuel Swartwout, James Alexander, Esq., and Peter V. Ogden, on a charge of treason, misprision of treason, or such other offence against the government and laws of the United States, as the following facts may legally charge them with, on the honor of a soldier, and on the Holy Evangelists of Almighty God, do declare and swear, that in the beginning of the month of October last, when in command at Natchitoches, a stranger was introduced to me by Colonel Cushing, by the name of Swartwout, who a few minutes after the colonel retired from the room, slipt into my hand a letter of formal introduction from Colonel Burr, of which the following is a correct copy:] [2]

[Here was set out the letter of July 25, 1806, given above.]

[2] [Together with a packet, which, he informed me, he was charged by the same person to deliver me in private; this packet contained a letter in cipher from Colonel Burr, of which the following is substantially as fair an interpretation as I have heretofore been able to make, the original of which I hold in my possession:] [2]

[Here was set out a translation of the cypher letter of July 29, given above.]

[2] [From 4 Cranch (8 U. S.) 455.]

[I instantly resolved to avail myself of the reference made to the bearer, and in the course of some days drew from him (the said Swartwout) the following disclosure: "That he had been dispatched by Colonel Burr from Philadelphia, had passed through the states of Ohio and Kentucky, and proceeded from Louisville for St. Louis, where he expected to find me, but discovering at Kaskaskias that I had descended the river, he procured a skiff, hired hands, and followed me down the Mississippi to Fort Adams, and from thence set out for Natchitoches, in company with Captains Sparks and Hooke, under the pretense of a disposition to take part in the campaign against the Spaniards, then depending. That Colonel Burr with the support of a powerful association, extending from New York to New Orleans, was levying an armed body of 7,000 men from the state of New York and the western states and territories, with a view to carry an expedition against the Mexican provinces, and that 500 men under Colonel Swartwout and a Colonel or Major Tyler, were to descend the Alleghany; for whose accommodation light boats had been built, and were ready." I inquired what would be their course. He said: "This territory would be revolutionized, where the people were ready to join them, and that there would be some seizing, he supposed, at New Orleans; that they expected to be ready to embark about the first of February, and intended to land at Vera Cruz, and to march from thence to Mexico." I observed that there were several millions of dollars in the bank of this place, to which he replied, "We know it full well." And on remarking that they certainly did not mean to violate private property, he said they "merely meant to borrow, and would return it; that they must equip themselves in New Orleans; that they expected naval protection from Great Britain; that the Capt. ——, and the officer of our navy, were so disgusted with the government that they were ready to join; that similar disgusts prevailed throughout the western country, where the people were zealous in favor of the enterprise, and that pilot boat built schooners were contracted for along our southern coast for their service; that he had been accompanied from the Falls of Ohio to Kaskaskias, and from thence to Fort Adams, by a Mr. Ogden, who had proceeded on to New Orleans with letters from Colonel Burr to his friends there." Swartwout asked me whether I had heard from Doctor Bollman; and on my answering in the negative, he expressed great surprise, and observed, "that the doctor and a Mr. Alexander had left Philadelphia before him, with despatches for me, and that they were to proceed by sea to New Orleans, where he said they must have arrived."

[Though determined to deceive him if possible, I could not refrain from telling Mr. Swartwout it was impossible that I could

ever dishonor my commission; and I believe I duped him by my admiration of the plan, and by observing, "that although I could not join in the expedition, the engagements which the Spaniards had prepared for me in my front, might prevent my opposing it," yet I did, the moment I had deciphered the letter, put it into the hands of Colonel Cushing, my adjutant and inspector, making the declaration that I should oppose the lawless enterprise with my utmost force. Mr. Swartwout informed me that he was under engagements to meet Colonel Burr at Nashville the 20th of November, and requested of me to write him, which I declined; and on his leaving Natchitoches, about the 18th of October, I immediately employed Lieutenant T. A. Smith to convey the information, in substance to the president, without the commitment of names; for, from the extraordinary nature of the project, and the more extraordinary appeal to me, I could not but doubt its reality, notwithstanding the testimony before me, and I did not attach solid belief to Mr. Swartwout's report respecting their intentions on this territory and city, until I received confirmatory advice from St. Louis. After my return from the Sabine, I crossed the country to Natchez, and on my descent of the Mississippi from that place, I found Swartwout and Peter V. Ogden at Fort Adams. With the latter I held no communication, but was informed by Swartwout, that he (Ogden) had returned so far from New Orleans, on his route to Tennessee, but had been so much alarmed by certain reports in circulation that he was afraid to proceed. I inquired whether he bore letters with him from New Orleans, and was informed by Swartwout that he did not, but that a Mr. Spence had been sent from New Orleans through the country to Nashville, with letters for Colonel Burr.

[I reached this city the 25th ultimo, and on the next morning James Alexander, Esq., visited me. He inquired of me aside whether I had seen Doctor Bollman, and on my answering in the negative, he asked me whether I would suffer him to conduct Bollman to me, which I refused. He appeared desirous to communicate something, but I felt no inclination to inculpate this young man, and he left me. A few days after he paid me a second visit, and seemed desirous to communicate, which I avoided until he had risen to take leave. I then raised my finger, and observed, "Take care, you are playing a dangerous game." He answered, "It will succeed." I again observed, "Take care." And he replied with a strong affirmation, "Burr will be here by the beginning of next month." In addition to these corroborating circumstances against Alexander, I beg leave to refer to the accompanying documents, A, B. From all which I feel no hesitation in declaring, under the solemn obligation of an oath, that I do believe the said Swartwout, Alexander, and Ogden, have been parties to, and have been concerned in, the insurrection form-

---

2 [From 4 Cranch (8 U. S.) 455.]

ed, or forming, in the states and territories on the Ohio and Mississippi rivers, against the laws and constitution of the United States.

[(Signed)          James Wilkinson.

[Sworn to, and subscribed before me, this 26th day of December, in the year of our Lord, 1806.

[(Signed)          George Pollock.

[Justice of the Peace for the County of Orleans.

[Deposition of William Eaton:

[Early last winter Col. Aaron Burr, late vice president of the United States, signified to me, at this place, that, under the authority of the general government, he was organizing a secret expedition against the Spanish provinces on our south-western borders, which expedition he was to lead, and in which he was authorized to invite me to take the command of a division. I had never before been made personally acquainted with Col. Burr, and, having for many years been employed in foreign service, I knew but little about the estimation this gentleman now held in the opinion of his countrymen and his government; the rank and confidence by which he had so lately been distinguished, left me no right to suspect his patriotism. I knew him a soldier. In case of a war with the Spanish nation, which, from the tenor of the president's message to both houses of congress, seemed probable, I should have thought it my duty to obey so honorable a call of my country; and, under that impression, I did engage to embark in the expedition. I had frequent interviews with Col. Burr in this city, and, for a considerable time, his object seemed to be to instruct me by maps, and other information, the feasibility of penetrating to Mexico; always carrying forward the idea that the measure was authorized by government. At length, some time in February, he began by degrees to unveil himself. He reproached the government with want of character, want of gratitude, and want of justice. He seemed desirous of irritating resentment in my breast by dilating on certain injuries he felt I had suffered from reflections made on the floor of the house of representatives concerning my operations in Barbary, and from the delays of government in adjusting my claims for disbursements on that coast during my consular agency at Tunis; and he said he would point me to an honorable mode of indemnity. I now began to entertain a suspicion that Mr. Burr was projecting an unauthorized military expedition, which, to me, was enveloped in mystery; and, desirous to draw an explanation from him, I suffered him to suppose me resigned to his counsel. He now laid open his project of revolutionizing the western country, separating it from the Union, establishing a monarchy there, of which he was to be the sovereign, and New Orleans to be his capital, organizing a force on the waters of the Mississippi, and extending conquest to Mexico. I suggested a number of impediments to his scheme, such as the republican habits of the citizens of that country, and their affection towards our present administration of government, the want of funds; the resistance he would meet from the regular army of the United States, on those frontiers, and the opposition of Miranda, in case he should succeed to republicanize the Mexicans.

[Mr. Burr found no difficulty in removing these obstacles. He said he had, the preceding season, made a tour through that country, and had secured the attachment of the principal citizens of Kentucky, Tennessee and Louisiana, to his person and his measures; declared he had inexhaustible resources to funds; assured me the regular army would act with him, and would be reinforced by ten or twelve thousand men from the above-mentioned states and territory, and from other parts of the Union; said he had powerful agents in the Spanish territory; and, as for Miranda, said Mr. Burr, we must hang Miranda. He now proposed to give me the second command in his army. I asked him who should have the chief command. He said, "General Wilkinson." I observed it was singular that he should count on General Wilkinson. The elevated rank and high trust he now held as commander in chief of our army and governor of a province, he would hardly put at hazard for any precarious prospects of aggrandizement. Mr. Burr said, General Wilkinson, balanced in the confidence of government, was doubtful of retaining much longer the consideration he now enjoyed, and was, consequently, prepared to secure to himself a permanency. I asked Mr. Burr if he knew General Wilkinson. He answered, "Yes," and echoed the question. I said I knew him well. "What do you know of him?" said Mr. Burr. I know, I replied, that General Wilkinson will act as lieutenant to no man in existence. "You are in an error," said Mr. Burr. "Wilkinson will act as lieutenant to me." From the tenor of repeated conversations with Mr. Burr, I was induced to believe the plan of separating the Union, which he had contemplated, had been communicated to, and approved of by, General Wilkinson (though I now suspect it an artful argument of seduction), and he often expressed a full confidence that the general's influence, the offer of double pay and double rations, the prospect of plunder, and the ambition of achievement, would draw the army into his measures. Mr. Burr talked of the establishment of an independent government west of the Alleghany as a matter of inherent constitutional right of the people, a change which would eventually take place, and for the operation of which the present crisis was peculiarly favorable. "There was," said he, "no energy in the government to be dreaded, and the divisions of political opinions throughout the Union was a circumstance of which we should profit." There were very many

enterprising men among us, who aspired to something beyond the dull pursuits of civil life, and who would volunteer in this enterprise, and the vast territory belonging to the United States, which offered to adventurers, and the mines of Mexico, would bring strength to his standard from all quarters. I listened to the exposition of Colonel Burr's views with seeming acquiescence. Every interview convinced me more and more that he had organized a deep-laid plot of treason in the west, in the accomplishment of which he felt fully confident, till, at length, I discovered that his ambition was not bounded by the waters of the Mississippi and Mexico, but that he meditated overthrowing the present government of our country. He said, if he could gain over the marine corps, and secure the naval commanders, Truxton, Preble, Decatur, and others, he would turn congress neck and heels out of doors, assassinate the president, seize on the treasury and the navy, and declare himself the protector of an energetic government. The honorable trust of corrupting the marine corps, and of sounding Commodore Preble and Captain Decatur, Colonel Burr proposed confiding to me. Shocked at this proposition, I dropped the mask, and exclaimed against his views. He talked of the degraded situation of our country, and the necessity of a blow by which its energy and its dignity should be restored; said, if that blow could be struck here at this time, he was confident of the support of the best blood of America. I told Colonel Burr he deceived himself in presuming that he, or any other man, could excite a party in this country who would countenance him in such a plot of desperation, murder and treason. He replied, that he, perhaps, knew better the dispositions of the influential citizens of this country than I did. I told him one solitary word would destroy him. He asked, "What word?" I answered, "Usurper." He smiled at my hesitation, and quoted some great examples in his favor. I observed to him, that I had lately traveled from one extreme of the Union to the other; and though I found a diversity of political opinion among the people, they appeared united at the most distance aspect of national danger. That, for the section of the Union to which I belonged, I would vouch, that should he succeed in the first instance here, he would within six weeks afterwards have his throat cut by Yankee militia.

[Though wild and extravagant Mr. Burr's last project, and though fraught with premeditated slaughter, I felt very easy on the subject, because its defeat he had deposited in my own hands. I did not feel so secure concerning that of disjointing the Union. But the very interesting and embarrassing situation in which his communications placed me, left me, I confess, at a stand to know how to conduct myself with propriety. He had committed no overt act of aggression against law. I could draw nothing from him in writing, nor could I learn that he had exposed his plans to any person near me, by whom my testimony could be supported. He had mentioned to me no persons who were principally and decidedly engaged with him, except General Wilkinson, a Mr. Alston, who I found was his son-in-law, and a Mr. Ephraim Kibby, late a captain of rangers in General Wayne's army. Satisfied that Mr. Burr was resolute in pushing his project of rebellion in the west of the Alleghany, and apprehensive that it was too well and too extensively organized to be easily suppressed, though I dreaded the weight of his character when laid in the balance against my solitary assertion, I brought myself to the resolution to endeavor to defeat it by getting him removed from among us, or to expose myself to all consequences, by a disclosure of his intentions. Accordingly, I waited on the president of the United States, and after some desultory conversation, in which I aimed to draw his view to the westward, I used the freedom to say to the president I thought Mr. Burr should be sent out of this country, and gave for reason that I believed him dangerous in it. The president asked where he should be sent. I mentioned London and Cadiz. The president thought the trust too important, and seemed to entertain a doubt of Mr. Burr's integrity. I intimated that no one, perhaps, had stronger grounds to mistrust Mr. Burr's moral integrity than myself; yet, I believed ambition so much predominated over him, that when placed on an eminence, and put on his honor, respect to himself would insure his fidelity. His talents were unquestionable. I perceived the subject was disagreeable to the president; and to give it the shortest course to the point, declared my concern that if Mr. Burr were not in some way disposed of, we should, within eighteen months, have an insurrection, if not a revolution, on the waters of the Mississippi. The president answered, that he had too much confidence in the information, integrity, and the attachment to the Union, of the citizens of that country, to admit an apprehension of the kind I am happy that events prove this confidence well placed. As no interrogatories followed my expression of alarm, I thought silence on the subject, at that time and place, became me. But I detailed, about the same time, the whole projects of Mr. Burr to certain members of congress. They believed Colonel Burr capable of anything, and agreed that the fellow ought to be hanged; but thought his projects too chimerical, and his circumstances too desperate, to give the subject the merit of serious consideration. The total security of feeling in those to whom I had rung the tocsin, induced me to suspect my own apprehensions unseasonable, or at least too deeply admitted; and, of course, I grew indifferent about the subject.

[Mr. Burr's visits to me became less frequent, and his conversation less familiar.

He appeared to have abandoned the idea of a general revolution, but seemed determined on that of the Mississippi; and, although I could perceive symptoms of distrust in him towards me, he manifested great solicitude to engage me with him in the enterprise. Weary of his importunity, and at once to convince him of my serious attachments, I gave the following toast to the public: The United States. Palsy to the brain that should plot to dismember, and leprosy to the hand that will not draw to defend our Union! I doubt whether the sentiment was better understood by any of my acquaintance than Colonel Burr. Our intercourse ended here. We met but seldom afterwards. I returned to my farm in Massachusetts and thought no more of Mr. Burr, nor his empire, till some time late in September or beginning of October, when a letter from Maurice Belknap, of Marietta, to Timothy E. Danielson, fell into my hands at Brimfield, which satisfied me that Mr. Burr had actually commenced his preparatory operations on the Ohio. I now spoke publicly of the fact; transmitted a copy of the letter from Belknap to the department of state, and about the same time forwarded, through the hands of the postmaster general, to the president of the United States, a statement in substance of what is here above detailed concerning the Mississippi conspiracy of the said Colonel Aaron Burr, which is said to have been the first formal intelligence received by the executive on the subject of the conspiracy being in motion.

[I know not whether my country will allow me the merit of correctness of conduct in this affair. The novelty of the duty might, perhaps, have embarrassed stronger minds than mine. The uprightness of my intentions, I hope will not be questioned. The interviews between Colonel Burr and myself, from which the foregoing statement has resulted, were chiefly in this city, in the months of February and March, last year.

[William Eaton.

[Washington City, Jan. 26, 1807.

[Sworn to in open court this 26th day of January, 1807

[William Brent, Clerk.

[Deposition of James L. Donaldson:

[In open court personally appears James Lowry Donaldson, who, being duly sworn, deposeth and saith, that he was in the city of New Orleans, in the Orleans territory, and the environs of said city, from the 15th day of October to the 10th day of December, 1806; that during the latter part of this time he was frequently in the company of General James Wilkinson, and visited the general the day after his arrival at New Orleans. On this occasion, this deponent received in confidence from General Wilkinson information to the following purport; that the general had undoubted and indisputable evidence of a treasonable design formed by Aaron Burr and others to dismember the Union, by a separation of the western states and territories from the Atlantic states; that New Orleans was in immediate danger, and that he had concluded a hasty compromise with the Spaniards, so as to be able to withdraw his troops instantly to this the immediate object of attack and great vulnerable point; that he had received a letter from Burr holding forth great inducements to him to become a party, of which he showed me the original in cypher, and another written paper purporting to be a deciphered copy of the letter. He expressed great indignation of the plot, and surprise that one so well acquainted with him as Burr should dare to make to him so degrading a proposal, and declared his determination of defeating the enterprise, or perishing in the attempt. He observed, in addition, that there were many agents of Mr. Burr then in the town, who had already been assiduous in their visits, and towards whom he was determined to act with cautious ambiguity, so as at the same time to become possessed of the whole extent of the plan, the persons engaged, and the time of its execution, and also to prevent any attempt on his person, of which he declared he had serious apprehensions. Of the number of these agents he was not aware, but mentioned the names of two of whom he was certain, Messrs. Bollman and Alexander. From time to time, as this deponent had interviews with General Wilkinson, he informed this deponent that he had received additional information respecting the movements and designs of Burr by means of these agents, of whom he considered Bollman as the principal. In the course of these transactions, this deponent was employed by General Wilkinson in the copying of certain papers and documents, and preparing certain despatches for the general government, which the general intended to forward by the brig Thetis. While thus employed at the general's lodgings, this deponent has remarked, upon two different occasions, a person knock for admittance at a door with a window in it opposite the table where this deponent was sitting, who, this deponent was informed by General Wilkinson, was Doctor Bollman. Upon these occasions the general has suddenly risen from his seat, and accompanied this person in a number of turns up and down a balcony in the front of the house, apparently engaged in deep conversation. Upon the latter of these occasions the general, on his return into the chamber, said to this deponent: "That is Doctor Bollman. His infatuation is truly extraordinary. He persists in his belief that I am with Burr, and has this moment shown me a letter from the latter, in which he says that he is to be at Natchez on the 20th December with 2,000 men, that 4,000 will follow in the course of a few days, and that he could, with the same ease, have procured double that number." General Wilkinson then observed that he had obtained all the information he wanted, and

that the affair would not be kept much longer a secret from the public. When this deponent left the city of New Orleans, the inhabitants of that city were in a state of great alarm, and apprehended a serious attack from Mr. Burr and his confederates. This deponent understood that mercantile business was much embarrassed, and great fears were entertained of considerable commercial failures in consequence of the embargo which had been imposed, that General Wilkinson was taking strong measures of defense, and that 400 persons were then actually engaged in the fortifications of the city. And further this deponent saith not.

[James L. Donaldson.

[Sworn to in open court.
[William Brent, Clerk.
[January 26, 1807.

[Deposition of Lieutenant W. Wilson:

[I left New Orleans on my way to this city on the 15th of December last. At that time and for some time preceding, the strongest apprehensions and belief universally prevailed among the inhabitants of that city, that Aaron Burr and his confederates had prepared an armed force, and were advancing to attack and plunder the city, in consequence of which the greatest alarms prevailed, a general stagnation of business ensued, and the danger was credited there as a matter of public notoriety; that Brigadier General Wilkinson, with the army of the United States, was at New Orleans, occupied in the most active military preparations for the defense of the place, repairing the forts, mounting cannon, collecting ammunition, etc.,—all under the firm persuasion and belief that such an attack was meditated, and about very speedily to take place, by the said Burr. This deponent knows that the general was decidedly of opinion, from the most satisfactory information, that the said Burr and his confederates were advancing with an armed force against this place. And further this deponent saith not.

[(Signed)              William Wilson.

[Sworn to in open court this 27th day of January, 1807.
[William Brent, Clerk.

[The deposition of Ensign W. C. Mead is precisely similar to that of Lieut. Wilson, except that the former states that he left New Orleans on the 19th of December.] [2]

Major Perkins testified that on the night of the 18th or 19th of February last, he was at Washington Court House. At about 11 o'clock, as he was standing at the door of the house occupied by the sheriff, he observed two men coming down the road. The moon afforded him light enough to enable him to see objects at some distance. The foremost man, who was thirty or forty yards before his companion, and who turned out to be Colonel Burr, passed near the door without stopping or speaking. Burr's companion stopped and inquired the way to Major Hinson's; the way was pointed out, but Perkins informed him that the major was from home, and that in consequence of a late rise in the waters, he would experience some difficulty in getting there that night; the stranger, however, went on. Perkins, struck with this midnight journey, the silence of the person who had first passed, the unwillingness of the travellers to stop at a public place, where they and their horses might have been accommodated, and their determination to continue their route to Hinson's after information was given that he was from home, communicated to the sheriff his suspicion that these men must be under the influence of some extraordinary motive. Possibly they might be robbers, or perhaps one of them was Burr endeavoring to make his escape. He had been informed that Burr had left Natchez. Impressed by these suspicions, he urged the sheriff, who had gone to bed, to arise and go with him to Hinson's. After some time the sheriff agreed to accompany him, and they went to Hinson's, where they found both the travellers. Burr, who had been in the kitchen to warm himself, soon came into the room where his companion and Perkins were. Perkins eyed him attentively, but never got a full view of his face. He discerned that Burr once glanced his eye at him, apparently with a view to ascertain whether Perkins was observing him, but withdrew it immediately. The latter had heard Mr. Burr's eyes mentioned as being remarkably keen, and this glance from him strengthened his suspicions. He determined immediately to take measures for apprehending him. He accordingly left the place, after mentioning in a careless manner the way he meant to take. The way he indicated was opposite to the course he thought Burr would pursue. After getting beyond the reach of observation he took the road to Fort Stoddart, and obtained the aid of the commandant and four soldiers." The commandant of the fort was Captain Gaines, (afterwards the well-known Major General Gaines.) At sunrise he and Perkins, with four dragoons, started in search of the travellers, and met them two miles from Hinson's house, about nine o'clock in the morning. Captain Gaines rode forward and addressed the suspected personage: "I presume, sir," said he, "that I have the honor of addressing Colonel Burr." "I am a traveller in the country," was the reply, "and do not recognize your right to ask such a question." Whereupon Gaines said, "I arrest you at the instance of the federal government." "By what authority do you arrest a traveller on the highway, on his own private business?" asked Burr. "I am an officer in the army," answered the captain, "and I hold in my hand the proclamation of the president and the governor directing your arrest."

[2] [From 4 Cranch (8 U. S.) 455.]

Major Perkins further testified that while they were on their way to Washington, at Chester Court House, in the back part of South Carolina, Mr. Burr, observing a small collection of people, got off his horse, went into the company, asked for a magistrate, and complained of being under an illegal arrest and military guard. Perkins, however, soon reinstated him on his horse, and directed the guard to proceed. The people manifested no disposition to interfere.

After the evidence was gone through, Mr. Hay, district attorney, submitted a motion in writing for the commitment of the prisoner on the two charges above mentioned. A discussion was then agreed, on both sides, to be necessary; and, in pursuance of the previous arrangement, Mr. Hay moved an adjournment to the capitol, to which the counsel of Colonel Burr assented. Colonel Burr was then admitted to bail in the sum of five thousand dollars, for his appearance on the following day, at ten o'clock, a. m.

### Tuesday, March 31, 1807.

At ten o'clock MARSHALL, Chief Justice, took his seat on the bench, in the court room, which was densely filled with citizens. Cæsar Rodney, attorney general of the United States, and George Hay, United States attorney for the district of Virginia, appeared as counsel for the prosecution. Counsel for Colonel Burr, Edmund Randolph, Esq., and John Wickham, Esq. On the suggestion of counsel that it would be impossible to accommodate the spectators in the court room, the chief justice adjourned to the hall of the house of delegates.

Mr. Hay opened the argument on the motion to commit. He stated the first offence to be a violation of the fifth section of an act of congress passed June 5, 1794 [1 Stat. 384], entitled "An act in addition to the act for the punishment of certain crimes against the United States," continued in force for limited periods by several succeeding laws, and continued without limitation by an act passed in 1797 [Id. 497]. Secondly, he insisted that there was probable cause to suspect that the prisoner had committed an act of treason; that he intended to take the city of New Orleans, make it the seat of his dominion and the capital of his empire; and that this charge was proved by the affidavits exhibited in the Cases of Bollman and Swartwout. He relied upon the opinion of the supreme court in that case as supporting the doctrine for which he contended, and went into a minute examination of the evidence to show that it brought the case within the definition of treason as laid down in said opinion. He also commented on the flight of Col. Burr from justice.

Mr. Wickham and Mr. Randolph replied, denying that there was any evidence that an overt act of treason had been committed, or probable cause to believe Col. Burr guilty of such a crime. As to the other charge, the evidence to sustain it was trivial, but if deemed sufficient to put him on his trial, it was a bailable offence; and in view of the fact that Col. Burr had been brought to a place where he had fewer friends than in almost any other part of the United States, it would be improper to require him to give bail in a large sum.

Col. Burr then addressed the court, not, as he said, to remedy any omission of his counsel, who had done great justice to the subject, but to state a few facts, and repel some observations of a personal nature. The present inquiry involved a simple question of treason or misdemeanor. According to the constitution, treason consisted in acts; an arrest could only be justified by the suspicion of acts; whereas, in this case, his honor was invited to issue a warrant upon mere conjecture. Alarms existed without cause. Mr. Wilkinson alarmed the president, and the president alarmed the people of Ohio. He appealed to historical facts. No sooner did he understand that suspicions were entertained in Kentucky of the nature and design of his movements, than he hastened to meet an investigation. The prosecution not being prepared, he was discharged. That he then went to Tennessee. While there he heard that the attorney for the district of Kentucky was preparing another prosecution against him; that he immediately returned to Frankfort, presented himself before the court, and again was honorably discharged; that what happened in the Mississippi territory was equally well known; that there he was not only acquitted by the grand jury, but they went farther, and censured the conduct of the government; and if there had been really any cause of alarm, it must have been felt by the people of that part of the country; that the manner of his descent down the river was a fact which put at defiance all rumors about treason or misdemeanor; that the nature of his equipments clearly evinced that his object was purely peaceable and agricultural; that this fact alone ought to overthrow the testimony against him; that his designs were honorable, and would have been useful to the United States. His flight, as it was termed, had been mentioned as evidence of guilt. He asked, at what time did he fly? In Kentucky he invited inquiry, and that inquiry terminated in a firm conviction of his innocence; that the alarms were at first great in the Mississippi territory, and orders had been issued to seize and destroy the persons and property of himself and party; that he endeavored to undeceive the people, and convince them that he had no designs hostile to the United States, but that twelve hundred men were in arms for a purpose not yet developed; the people could not be deceived; and he was acquitted, and promised the protection of the government; but the promise could not be performed; the arm of military

power could not be resisted; that he knew there were military orders to seize his person and property, and transport him to a distance from that place; that he was assured by the officer of an armed boat, that it was lying in the river ready to receive him on board. Was it his duty to remain there thus situated? That he took the advice of his best friends, pursued the dictates of his own judgment, and abandoned a country where the laws ceased to be the sovereign power; that the charge stated in a hand-bill, that he had forfeited his recognizance, was false; that he had forfeited no recognizance; if he had forfeited any recognizance, he asked why no proceedings had taken place for the breach of it? If he was to be prosecuted for such breach, he wished to know why he was brought to this place? Why not carry him to the place where the breach happened? That more than three months had elapsed since the order of the government had issued to seize and bring him to that place; yet it was pretended that sufficient time had not been allowed to adduce testimony in support of the prosecution. He asked why the guard who conducted him to that place avoided every magistrate on the way, unless from a conviction that they were acting without lawful authority? Why had he been debarred the use of pen, ink, and paper, and not even permitted to write to his daughter? That in the state of South Carolina, where he happened to see three men together, he demanded the interposition of the civil authority; that it was from military despotism, from the tyranny of a military escort, that he wished to be delivered, not from an investigation into his conduct, or from the operation of the laws of his country. He concluded that there were three courses that might be pursued,—an acquittal; or a commitment for treason, or for a misdemeanor; that no proof existed in support of either but what was contained in the affidavits of Eaton and Wilkinson, abounding in crudities and absurdities.

Mr. Rodney, attorney general, then closed the argument on behalf of the United States.

The CHIEF JUSTICE remarked that he would deliver an opinion in writing the next day, and thereupon Col. Burr's recognizance was renewed for his appearance at the capitol on the following day at ten o'clock.

Wednesday, April 1, 1807.

MARSHALL, Chief Justice. I am required on the part of the attorney for the United States to commit the accused on two charges: (1) For setting on foot and providing the means for an expedition against the territories of a nation at peace with the United States. (2) For committing high treason against the United States.

On an application of this kind I certainly should not require that proof which would be necessary to convict the person to be committed, on a trial in chief; nor should I even require that which should absolutely convince my own mind of the guilt of the accused; but I ought to require, and I should require, that probable cause be shown; and I understand probable cause to be a case made out by proof furnishing good reason to believe that the crime alleged has been committed by the person charged with having committed it. I think this opinion entirely reconcilable with that quoted from Judge Blackstone. When that learned and accurate commentator says, that "if upon an inquiry it manifestly appears that no such crime has been committed, or that the suspicion entertained of the prisoner was wholly groundless, in such cases only it is lawful totally to discharge him, otherwise he must be committed to prison or give bail," I do not understand him as meaning to say that the hand of malignity may grasp any individual against whom its hate may be directed, or whom it may capriciously seize, charge him with some secret crime, and put him on the proof of his innocence. But I understand that the foundation of the proceeding must be a probable cause to believe there is guilt; which probable cause is only to be done away in the manner stated by Blackstone. The total failure of proof on the part of the accuser would be considered by that writer as being in itself a legal manifestation of the innocence of the accused. In inquiring, therefore, into the charges exhibited against Aaron Burr, I hold myself bound to consider how far those charges are supported by probable cause.

The first charge stands upon the testimony of General Eaton and General Wilkinson. The witness first named proves that among other projects which were more criminal, Colonel Burr meditated an expedition against the Mexican dominions of Spain. This deposition may be considered as introductory to the affidavit of General Wilkinson, and as explanatory of the objects of any military preparations which may have been made. I proceed, then, to that affidavit. To make the testimony of General Wilkinson bear on Colonel Burr, it is necessary to consider as genuine the letter stated by the former to be, as nearly as he can make it, an interpretation of one received in cypher from the latter. Exclude this letter, and nothing remains in the testimony which can in the most remote degree affect Colonel Burr. That there are to the admissibility of this part of the affidavit great and obvious objections need not be stated to those who know with how much caution proceedings in criminal cases ought to be instituted, and who know that the highest tribunal of the United States has been divided on them. When this question came before the supreme court, I felt the full force of these objections, although I did not yield to them. On weighing in my own mind the reasons for and against acting, in this stage of the business, on that part of the affidavit, those in favor of doing so appeared to me to preponderate, and, as

this opinion was not overruled, I hold myself still at liberty to conform to it. That the original letter, or a true copy of it accompanied by the cypher, would have been much more satisfactory, is not to be denied; but I thought, and I still think, that, upon a mere question whether the accused shall be brought to trial or not, upon an inquiry not into guilt but into probable cause, the omission of a circumstance which is indeed important, but which does not disprove the positive allegations of an affidavit, ought not to induce its rejection or its absolute disbelief, when the maker of the affidavit is at too great a distance to repair the fault. I could not in this stage of the prosecution absolutely discredit the affidavit, because the material facts alleged may very well be within the knowledge of the witness, although he has failed to state explicitly all the means by which this knowledge is obtained. Thus, General Wilkinson states that this letter was received from Colonel Burr, but does not say that it was in his hand-writing, nor does he state the evidence which supports this affirmation. But, in addition to the circumstance that the positive assertion of the fact ought not perhaps, in this stage of the inquiry, to be disregarded, the nature of the case furnishes that evidence. The letter was in cypher. General Wilkinson, it is true, does not say that a cypher had been previously settled between Colonel Burr and himself, in which they might correspond on subjects which, though innocent, neither of them might wish to subject to the casualties of a transportation from the Atlantic to the Mississippi; but when we perceive that Colonel Burr has written in cypher, and that General Wilkinson is able to decypher the letter, we must either presume that the bearer of the letter was also the bearer of its key, or that the key was previously in possession of the person to whom the letter was addressed. In stating particularly the circumstances attending the delivery of this letter, General Wilkinson does not say that it was accompanied by the key, or that he felt any surprise at its being in cypher. For this reason, as well as because there is not much more security in sending a letter in cypher, accompanied by its key, than there is in sending a letter not in cypher, I think it more reasonable to suppose that the key was previously in possession of Wilkinson. If this was the fact, the letter being written in a cypher previously settled between himself and Colonel Burr, is, in this stage of the inquiry at least, a circumstance which sufficiently supports the assertion that the letter was written by Colonel Burr. The enterprise described in this letter is obviously a military enterprise, and must have been intended either against the United States, or against the territories of some other power on the continent, with all of whom the United States were at peace. The ex-

pressions of this letter must be admitted to furnish at least probable cause for believing that the means for the expedition were provided. In every part of it we find declarations indicating that he was providing the means for the expedition; and as these means might be provided in secret, I do not think that further testimony ought to be required to satisfy me that there is probable cause for committing the prisoner on this charge. Since it will be entirely in the power of the attorney general to prefer an indictment against the prisoner, for any other offence which he shall think himself possessed of testimony to support, it is, in fact, immaterial whether the second charge be expressed in the warrant of commitment or not; but as I hold it to be my duty to insert every charge alleged on the part of the United States, in support of which probable cause is shown, and to insert none in support of which probable cause is not shown, I am bound to proceed in the inquiry.

The second charge exhibited against the prisoner is high treason against the United States in levying war against them. As this is the most atrocious offence which can be committed against the political body, so is it the charge which is most capable of being employed as the instrument of those malignant and vindictive passions which may rage in the bosoms of contending parties struggling for power. It is that of which the people of America have been most jealous, and therefore, while other crimes are unnoticed, they have refused to trust the national legislature with the definition of this, but have themselves declared in their constitution that "it shall consist only in levying war against the United States, or in adhering to their enemies, giving them aid and comfort." This high crime consists of overt acts, which must be proved by two witnesses, or by the confession of the party in open court. Under the control of this constitutional regulation, I am to inquire whether the testimony laid before me furnishes probable cause in support of this charge. The charge is, that the fact itself has been committed, and the testimony to support it must furnish probable cause for believing that it has been actually committed, or it is insufficient for the purpose for which it is adduced. Upon this point, too, the testimony of General Eaton is first to be considered. That part of his deposition which bears upon this charge is the plan disclosed by the prisoner for seizing upon New Orleans, and revolutionizing the Western states. That this plan, if consummated by over acts, would amount to treason, no man will controvert. But it is equally clear that an intention to commit treason is an offence entirely distinct from the actual commission of that crime. War can only be levied by the employment of actual force. Troops must be embodied. men must be assembled, in order to levy war. If Colonel Burr had

been apprehended on making these communications to General Eaton, could it have been alleged that he had gone further than to meditate the crime? Could it have been said that he had actually collected forces and had actually levied war? Most certainly it could not. The crime really complete was a conspiracy to commit treason, not an actual commission of treason. If these communications were not treason at the instant they were made, no lapse of time can make them so. They are not in themselves acts. They may serve to explain the intention with which acts were committed, but they cannot supply those acts if they be not proved. The next testimony is the deposition of General Wilkinson, which consists of the letter already noticed, and of the communications made by the bearer of that letter. This letter has already been considered by the supreme court of the United States, and has been declared to import, taken by itself or in connection with Eaton's deposition, rather an expedition against Mexico than the territories of the United States. By that decision I am bound, whether I concurred in it or not. But I did concur in it. On this point the court was unanimous. It is, however, urged that the declarations of Swartwout may be connected with the letter and used against Colonel Burr. Although the confession of one man cannot criminate another, yet I am inclined to think that, on a mere inquiry into probable cause, the declaration of Swartwout made on this particular occasion may be used against Colonel Burr. My reason for thinking so is, that Colonel Burr's letter authorizes Mr. Swartwout to speak in his name. He empowers Mr. Swartwout to make to General Wilkinson verbal communications explanatory of the plans and designs of Burr, which Burr adopts as his own explanations. However inadmissible, therefore, this testimony may be on a trial in chief, I am inclined to admit it on this inquiry. If it be admitted, what is its amount? Upon this point, too, it appears that the supreme court was divided. I therefore hold myself at liberty to pursue my own opinion, which was, that the words, "this territory must be revolutionized," did not so clearly apply to a foreign territory as to reject that sense which would make them applicable to a territory of the United States, at least so far as to admit of further inquiry into their meaning. And if a territory of the United States was to be revolutionized, though only as a means for an expedition against a foreign power, the act would be treason. This reasoning leads to the conclusion that there is probable cause for the allegation that treasonable designs were entertained by the prisoner so late as July last, when this letter was written.

It remains to inquire whether there is also probable cause to believe that these designs have been ripened into the crime itself, by actually levying war against the United States. It has been already observed that, to constitute this crime, troops must be embodied, men must be actually assembled; and these are facts which cannot remain invisible. Treason may be machinated in secret, but it can be perpetrated only in open day, and in the eye of the world. Testimony of a fact which in its own nature is so notorious ought to be unequivocal. The testimony now offered has been laid before the supreme court of the United States and has been determined in the Cases of Bollman and Swartwout. [4 Cranch (8 U. S.) 75], not to furnish probable cause for the opinion that war had been actually levied. Whatever might have been the inclination of my own mind in that case, I should feel much difficulty in departing from the decision then made, unless this case could be clearly distinguished from it. I will, however, briefly review the arguments which have been urged, and the facts now before me, in order to show more clearly the particular operation they have on my own judgment. The fact to be established is, that in pursuance of these designs, previously entertained, men have been actually assembled for the purpose of making war against the United States; and on the showing of probable cause that this fact has been committed, depends the issue of the present inquiry. The first piece of testimony relied on to render this fact probable is the declaration of Mr. Swartwout, that "Colonel Burr was levying an armed body of 7,000 men from the state of New York, and the Western states and territories, with a view to carry an expedition against the Mexican provinces." The term "levying" has been said, according to the explanation of the lexicons, to mean the embodying of troops, and therefore to prove what is required. Although I do not suppose that Mr. Swartwout had consulted a dictionary, I have looked into Johnson for the term, and find its first signification to be "to raise;" its second, "to bring together." In common parlance, it may signify the one or the other. But its sense is certainly decided by the fact. If when Mr. Swartwout left Colonel Burr, which must be supposed to have been in July, he was actually embodying men from New York to the Western states, what could veil his troops from human sight? An invisible army is not the instrument of war, and had these troops been visible, some testimony relative to them could have been adduced. I take the real sense, then, in which this term was used to be, that Colonel Burr was raising, or in other words engaging or enlisting, men through the country described, for the enterprise he meditated. The utmost point to which this testimony can be extended is, that it denotes a future embodying of men, which is more particularly mentioned in the letter itself, and that it affords probable cause to believe that the troops did actually embody at the period des-

ignated for their assembling, which is sufficient to induce the justice to whom the application is made to commit for trial. I shall readily avow my opinion, that the strength of the presumption arising from this testimony ought to depend greatly on the time at which the application is made. If soon after the period at which the troops were to assemble, when full time had not elapsed to ascertain the fact, these circumstances had been urged as the ground for a commitment on the charge of treason, I should have thought them entitled to great consideration. I will not deny that, in the Cases of Bollman and Swartwout, I was not perfectly satisfied that they did not warrant an inquiry into the fact. But I think every person must admit that the weight of these circumstances daily diminishes. Suspicion may deserve great attention when the means of ascertaining its real grounds are not yet possessed; but when those means are, or may have been acquired, if facts to support suspicion be not shown, every person, I think, must admit that the ministers of justice at least ought not officially to entertain it. This, I think, must be conceded by all; but whether it be conceded by others or not, it is the dictate of my own judgment, and in the performance of my duty I can know no other guide.

The fact to be proved in this case is an act of public notoriety. It must exist in the view of the world, or it cannot exist at all. The assembling of forces to levy war is a visible transaction, and numbers must witness it. It is therefore capable of proof; and when time to collect this proof has been given, it ought to be adduced, or suspicion becomes ground too weak to stand upon. Several months have elapsed since this fact did occur, if it ever occurred. · More than five weeks have elapsed since the opinion of the supreme court has declared the necessity of proving the fact, if it exists. Why is it not proved? To the executive government is intrusted the important power of prosecuting those whose crimes may disturb the public repose or endanger its safety. It would be easy, in much less time than has intervened since Colonel Burr has been alleged to have assembled his troops, to procure affidavits establishing the fact. If, in November or December last, a body of troops had been assembled on the Ohio, it is impossible to suppose that affidavits establishing the fact could not have been obtained by the last of March. I ought not to believe that there has been any remissness on the part of those who prosecute on this important and interesting subject; and consequently, when at this late period no evidence that troops have been actually embodied is given. I must say that the suspicion which in the first instance might have been created ought not to be continued, unless this want of proof can be in some manner accounted for.

It is stated by the attorney for the United States that, as affidavits can only be voluntary, the difficulty of obtaining them accounts for the absence of proof. I cannot admit this position. On the evidence furnished by this very transaction of the attachment felt by our western for their eastern brethren, we justly felicitate ourselves. How inconsistent with this fact is the idea that no man could be found who would voluntarily depose that a body of troops had actually assembled, whose object must be understood to be hostile to the Union, and whose object was detested and defeated by the very people who could give the requisite information! I cannot doubt that means to obtain information have been taken on the part of the prosecution; if it existed, I cannot doubt the practicability of obtaining it; and its non-production at this late hour does not, in my opinion, leave me at liberty to give to those suspicions which grow out of other circumstances that weight to which at an earlier day they might have been entitled. I shall not therefore insert in the commitment the charge of high treason. I repeat, that this is the less important, because it detracts nothing from the right of the attorney to prefer an indictment for high treason, should he be furnished with the necessary testimony.

The CHIEF JUSTICE having delivered his opinion, observed, that as Colonel Burr would be put on his trial for carrying on a military expedition against a nation with whom the United States were at peace, his case was of course bailable. Some discussion then arose as to the amount of bail to be required. The sum was finally fixed at ten thousand dollars; and after a brief adjournment, Colonel Burr, with five sureties entered into a recognizance in that sum, for his appearance at the next circuit court for the district of Virginia, to commence on the 22d day of May following

### NOTE.

Historical Sketch of Burr's Western Expedition in the Year 1806.

After his· fatal duel with Hamilton, in July, 1804, Colonel Burr became a fugitive and an exile from his home, until the meeting of congress in December following. Ten days after the duel, he left New York at night, by water, landed the next morning at the residence of Commodore Truxton, in New Jersey, and thence made his way, incog., by back roads, to Philadelphia. He remained in that city until a coroner's inquest had pronounced him guilty of murder and a warrant had been issued for his arrest. Fearing that a requisition would be made upon the governor of Pennsylvania by the governor of New York, for his surrender, he secretly left Philadelphia about the middle of August, by sea, sailing for the island of St. Simons. off the coast of Georgia, where a few wealthy planters resided. among whom he had some personal friends. There he was hospitably received. and entertained for about a month. He then visited his daughter, at her home in South Carolina, where he remained until he started on his journey to Washington, to preside over the last session of the United States during the last session of his term as vice president. On reaching Washington, he learned that indictments for murder were pend-

ing against him in two states—New York, where Hamilton died, and New Jersey, where the mortal wound was inflicted. No attempt was made, however, to bring him to trial on either. He was received at Washington with the consideration due to his distinguished political position; and he presided over the deliberations of the senate with a dignity, ability, and impartiality which increased his fame as an unrivaled presiding officer. It was during this session that Judge Chase, of the supreme court, was tried on articles of impeachment preferred by the house of representatives. "The impeachment created an intense interest, and the trial attracted a concourse of people to Washington. Under the direction of the vice president, the senate chamber was fitted up in superb style, with seats and subdivisions for all the dignitaries of the nation, as well as for foreign embassadors and spectators. The senators, as judges of this high court, were placed in a grand semicircle on each side of the vice president—an awful array of judicial authority. Temporary galleries were erected and draped with blue cloth, part of which the vice president, with his usual gallantry, appropriated to the ladies. The scene presented while the trial was in progress, as described minutely in the papers of the day, must have been extremely striking. The trial began on the 4th of February, and ended, in a verdict of acquittal, on the 1st of March. The dignity, the grace, the fairness, the prompt, intelligent decision with which the vice president presided over the august court, extorted praise even from his enemies. 'He conducted the trial,' said a newspaper of the day, 'with the dignity and impartiality of an angel, but with the rigor of a devil.' There was a rising tide of reaction in his favor during the closing days of his public life, which, taken at the flood, might have led, if not to fortune, yet to an endurable existence among his countrymen." Parton's Life of Burr. On Saturday, the 2d of March, the vice president took leave of the senate in a speech which produced a profound sensation. This speech was delivered when the senate, being engaged in executive business, was sitting with closed doors, and no authentic report of it has been preserved. In an account of it published at the time in the Washington Federalist, and prepared at the editor's request, by an unknown hand, it is said to have been pronounced by those who heard it, "the most dignified, sublime, and impressive that ever was uttered." "The whole senate," says the same writer, "were in tears, and so unmanned that it was half an hour before they could recover themselves sufficiently to come to order and choose a vice president pro tem." Yet on retiring from the vice presidency, Colonel Burr was a bankrupt, both in political influence and pecuniary resources. If he returned to his home, it would be to encounter indictments for murder and executions against his body for debt. He therefore determined to seek his fortune in a new country.

During his winter's residence in Washington, many of Colonel Burr's friends and admirers had manifested a deep interest in his future, and had been busy devising schemes for retrieving his fortunes, and for bringing him again into political life as a representative from some new state or territory. Conspicuous among these was General Wilkinson, commander in chief of the army, and appointed, about the close of that session of congress, governor of the territory of Louisiana. Between Wilkinson and Burr a friendship of long standing had subsisted. They had been fellow-soldiers in the war of the Revolution—had shared together the weary march to Quebec in the winter of 1775-76, and the perils of the unsuccessful attack on that city, in which their commander, the gallant Montgomery, fell. Though seldom meeting after the war, they had occasionally corresponded, confidentially, in cipher, of which Wilkinson was the inventor. In 1787, Wilkinson, then a citizen of that portion of Virginia which is now the state of Kentucky, having laden a boat with tobacco and flour, had descended the Ohio and Mississippi rivers to New Orleans, with the ostensible purpose of making arrangements with the Spanish authorities by which to secure to the inhabitants of the upper country the free navigation of the Mississippi and a market for their products. Although, on landing, his cargo was seized by the authorities, he had the address to obtain its release, and such further privileges of trading in that city as induced him to establish himself in business there, carrying on a trade, principally in tobacco, from the upper country, for several years. In the year 1791, however, he resumed his military career, obtaining an appointment in the army of the United States, and being placed in the command of the western posts. He was now about to return to the Louisiana country, as governor of all that portion of it not included in the territory of Orleans, now comprising the state of Louisiana. In that direction it was natural that Colonel Burr should turn his eyes. Wilkinson was an arch intriguer, and some years before had been at the head of a party in the West who favored the separation of the Western territories from the Atlantic states. While carrying on trade in New Orleans he had been deeply implicated in an intrigue with the Spanish authorities, having for its object the separation of the district of Kentucky from the United States, and its annexation to the Spanish territory of Louisiana. Whether he really desired the accomplishment of this object, or was merely playing a game with the Spanish authorities for the advancement of his own selfish interests, may be doubted; but the evidence that he was deeply engaged in such an intrigue is now overwhelming. If Burr at this time contemplated any illicit enterprise, looking either to a separation of the Western states and territories from the Union, or an invasion of the Spanish dominions, or both, Wilkinson was the man, of all others, to whom he would have been most likely to disclose his views, and whose co-operation he would be most likely to seek. He was ambitious, exceedingly fond of pomp and show, extravagant in his habits, poor, and addicted to intrigue. On leaving Washington, at the end of his official term, Colonel Burr went to Philadelphia, and there remained about a month. On the 10th of April he started for Pittsburg, performing the journey on horseback in nineteen days. The next day after reaching Pittsburg, he, with a companion, acting as his secretary, embarked for the lower country in a boat which he had previously ordered to be in readiness for that purpose. "This boat was a rude floating house, or ark, sixty feet long and fourteen wide, containing four apartments; a dining room, a kitchen, with fire-place, and two bed-rooms, all lighted by glass windows, and the whole covered by a roof, which served as a promenade deck. The cost of this commodious structure, he found to his astonishment, was only one hundred and thirty-three dollars. Of propelling power it had none, but merely floated down the swift and winding stream, aided occasionally, and kept clear of snags and sand-banks, by a dexterous use of the pole." Parton's Life of Burr. The Ohio river then wound its way through a wilderness just beginning to be marked by the footprints of approaching civilization. Marietta was the most considerable town on its northwestern bank, above Cincinnati, and its vicinity was the longest settled and best improved portion of the new state of Ohio. Colonel Burr landed at Marietta on the 5th of May, where he saw houses "that would be called handsome anywhere."

Fourteen miles below Marietta is the celebrated island on which Harman Blennerhassett, an Irish gentleman of education and refinement, with his accomplished wife and two young children, then lived in a style which was regarded by the denizens of that new country as a true type of princely magnificence. This island is nearly three miles in length, and less than one-fourth of a mile in width, containing between three and four hundred acres of very fertile

land. At this time it had been the residence of Blennerhassett about seven years. At a cost of some fifty thousand dollars, he had subdued the wilderness, and erected on the summit of the island, near its upper end, a mansion house of commodious proportions. He had laid out and improved a capacious lawn, planted choice fruits, and embellished his grounds with flowers and shrubbery of rare beauty. The highly-colored picture of this "Eden," drawn by Mr. Wirt in his celebrated speech on the trial of Burr, does not much surpass a description given by the Hon. Charles Fenton Mercer, in a deposition which was read during the pendency of the subsequent motion to commit Burr, Blennerhassett, and Smith for trial in another district. He had visit-ed Blennerhassett in his "island home," and spent a night and a day under his roof, shortly before he left it to follow the fortunes of Burr in his disastrous expedition. "That evening and the following day," he says in his deposition, "I spent at the most elegant seat in Virginia, in the society of Mr. Blennerhassett and his lovely and accomplished lady." Blennerhassett "was the youngest son of a distinguished family which could trace its lineage from the time of King John. His grandfather, Robert, having emigrated from Cumberland, in the time of Eliza-beth, became the head of three highly respectable branches of Irish gentry." His wife was "a Miss Agnew, daughter of the lieutenant governor of the Isle of Man, and grand-daughter of the celebrated general of that name who fell at the battle of Germantown." Safford's "Blennerhas-sett Papers." He was educated for the bar, but shortly after having attained the degree of barrister, by the death of his elder brother he succeeded to the family estates, and abandoned the pursuit of his profession. In 1796 Blenner-hassett emigrated to the United States, and two years later established himself on the island where Colonel Burr found him. He was a man of literary tastes, exceedingly fond of music and chemistry, in both of which he was quite a pro-ficient. Supplied with an ample library, an ex-tensive chemical apparatus, and musical instru-ments, and owning a few negro slaves, he was here enjoying a life of elegant ease, and dispens-ing a generous hospitality to all who visited his "enchanted isle." He had, however, invested too large a proportion of his fortune (originally about $100,000) in unproductive property, which could minister only to refined tastes and luxurious habits; and he could hardly have maintained his style of living many years longer, even if he had abstained from embarking in the disastrous enter-prise which precipitated his ruin. On his voy-age down the river, Colonel Burr and his secre-tary landed on the island, with no other motive, probably, than that of strolling over the grounds. Mrs. Blennerhassett, observing them, sent a servant to invite the strangers to the house. Burr declined the invitation, sending his card. On learning the name of the distinguished visiter, the lady, in the temporary absence of her hus-band, came out herself to press the invitation. Burr yielded, dined with the family, remained with them till eleven o'clock in the evening, and then proceeded on his voyage. The host and hostess were equally captivated by their visiter. At Cincinnati, then a town of about fifteen hun-dred inhabitants, Colonel Burr spent a day at the house of John Smith, a senator of the Unit-ed States for the state of Ohio, and there met his friend Jonathan Dayton, an ex-senator from the state of New Jersey, both of whom were sub-sequently connected with him his Western expedition, and were indicted with him for treason. At Lou-isville, Colonel Burr left his boat and proceeded on horseback to Nashville. There he was greeted with the utmost enthusiasm, public dinners, balls, and parties being given in honor of his visit.

Before leaving Washington, one of the schemes suggested for bringing Colonel Burr into public life again was the following, proposed by Mat-thew Lyon, a member of congress from Ken-tucky, which is here given in his own words:

"Let Colonel Burr mount his horse on the 4th of March, and ride through Virginia to Tennes-see, giving out that he intends settling in Nash-ville, in the practice of the law. Let him com-mence the practice, and fix himself a home there. His rencontre with General Hamilton will not injure him. Let him attend the courts in that district. Let him in July next intimate to some of the numerous friends his preëminent talents and suavity of manners will have made for him, that he would willingly serve the district in con-gress. They will set the thing on foot, and he is sure to be elected: there is no constitutional bar in the way." This scheme, Mr. Lyon says, was suggested by him to General Wilkinson, who appeared to be highly pleased with it. It was subsequently suggested to Burr himself; but he does not appear to have very earnestly en-tered into it. Colonel Burr remained four days at Nashville, and was the guest of General Jack-son, with whom he had contracted a warm friend-ship at Washington. On the 3d of June, he, with his secretary, embarked in an open boat to descend the Cumberland river, at the mouth of which they found their "ark," and resumed their voyage down the Ohio. At Fort Massac, sixteen miles below the mouth of the Cumber-land, he met General Wilkinson, who was on his way to the theatre of his new official duties. According to General Wilkinson's account of this interview, the subjects of their conversations were perfectly legitimate: relating to a project for making a canal around the falls of the Ohio, to land speculations, and to a scheme for get-ting Burr into congress. Wilkinson fitted Burr out with "an elegant barge, sails, colors, and ten oars, with a sergeant and ten able, faithful hands," to pursue his voyage to New Orleans; and gave him letters of introduction to his friends in that city. June 25th, sixty-seven days after leaving Philadelphia, the voyager landed on the levee of New Orleans. He was strongly prepos-sessed in favor of the place. " 'I hear so many pleasant things of Orleans,' he wrote to his daugh-ter, 'that I should certainly (if one half of them are verified on inspection) settle down there were it not for Theodosia and her boy: but these will control my fate.' The city then contained about nine thousand inhabitants. Three hundred sea-going vessels and six hundred river flatboats ar-rived annually at its levees. Four forts, one at each angle of the city, half a mile apart, defend-ed the city. Two of these were regularly con-structed fortresses, with fosse, glacis, and draw-bridge. The two behind the city were stockades. Since the departure of the Spaniards these for-tifications had been partly dismantled, but were capable, in a few weeks, of being restored to their original strength. In 1805 the chief defence of the place was a volunteer corps of Americans and creoles, commanded by Daniel Clark, the great merchant of the city, the founder of that prodigious fortune for which his daughter, Mrs. Gaines, has so long contended in the courts. Daniel Clark had emigrated from England in 1786, and had grown in wealth with the ever-growing prosperity of the city. He had been ardent for the transfer of the province to the United States, was now the leader of the Ameri-can party in New Orleans, and seemed to be a zealous friend of the Union. To him Colonel Burr presented the following letter of introduc-tion from General Wilkinson:

" 'My Dear Sir: This will be delivered to you by Colonel Burr, whose worth you know well how to estimate. If the persecutions of a great and honorable man can give title to generous at-tentions, he has claims to all your civilities and all your services. You cannot oblige me more than by such conduct, and I pledge my life to you it will not be misapplied. To him I refer you for many things improper to letter, and which he will not say to any other I shall be at St. Louis in two weeks, and if you were there we could open a mine, a commercial one at least. Let me hear from you. Farewell, do well, and believe me always your friend.'

"This epistle produced the effect desired. Burr became intimate with Clark, as with all the important persons of the place. He was received everywhere as the great man! Governor Claiborn (governor of Orleans territory) gave him a grand dinner, which was attended by as distinguished a company as New Orleans could assemble. Banquet followed banquet; fête succeeded fête; ball followed ball. The French air that surrounded everything, the French manner and tone of society, were as pleasing as they were novel to the traveller. The days flew swiftly by. Burr staid three weeks in New Orleans. Wilkinson said in his letter of introduction, that Burr would make communications to Clark which were 'improper to letter.' What were they? Burr was not a person to waste three weeks in mere feasting and playing the great man Wherever he was, whatever he was, he was busy. He had the quickest, most active mind that ever animated five feet six inches of mortality. It is certain that he did something at New Orleans during those three weeks. What? The question has been answered, first, by Wilkinson in his ponderous memoirs; secondly, by Daniel Clark in his angry octavo, entitled 'Proofs of the Corruption of General James Wilkinson, and of his Connection with Aaron Burr'; thirdly, by Matthew L. Davis, speaking for Burr himself. Wilkinson says the reference in his letter of introduction was simply an election scheme. Clark declares that Burr confided nothing to him whatsoever. He says he liked Burr exceedingly, invited him to dinner, showed him every possible civility, but had not a syllable of confidential conversation with him. In the most positive and circumstantial manner he denies that he had then, or ever had, any participation in or knowledge of Burr's designs. Davis, on the contrary, asserts that Clark and Wilkinson were both ardently engaged with Burr; and that Clark agreed to advance fifty thousand dollars in furtherance of the great project. Other friends of Burr say that Clark made two voyages to Vera Cruz, to spy out the enemy's country. Clark admits having made the voyages, (one in September, 1805, the other in February, 1806:) admits having collected information in Mexico respecting the strength of the fortresses, the number of the garrisons, and the disposition of the people; but asserts that his voyages had none but commercial objects, and that his inquiries were only prompted by curiosity. A witness deposed to having heard Clark say that he would willingly join in a private scheme for the conquest of Mexico, provided the adventurers could turn their backs forever on the United States. 'You, for example, might be a duke,' was one expression which the witness swore he had heard Clark use in the course of the same conversation. The difficulty of arriving at certainty on this subject, arises from the fact that most of the existing evidence was given after the explosion. It was amusing, says Burnet (in his 'Notes'), to see men who before the president's proclamation appeared had been loudest in Burr's praises, and deepest in his schemes, making haste after that bolt had shivered the project to atoms to denounce the traitor at every corner, and running to offer their services to the governor in defence of a distracted and imperilled country." Parton's Life of Burr.

In the latter part of July Colonel Burr left New Orleans on horseback, to return to Nashville, travelling a great portion of the way (under the direction of a guide) through an unbroken wilderness, with no better roads than mere Indian trails. He arrived at Nashville on the 6th of August, where he was again received with distinguished attention. He remained there a week, the guest of General Jackson, as on his former visit. He then made a two weeks' tour in Kentucky, visiting Louisville, Frankfort, and Lexington, at all of which he was received and entertained with great distinction. At this time the Spaniards still claimed and held possession of the country on the eastern bank of the lower Mississippi, and about the time of Burr's visit the ill feeling which had long prevailed towards them, among the American citizens of the Mississippi valley, had been greatly inflamed by some outrages committed by the Spanish troops on the American side. A war with Spain was confidently expected, and the impression got abroad in the West that Burr's presence had some reference to approaching hostilities against some portion of the Spanish dominions. A military expedition against the hated "Dons" would at that time have met great favor among the Western people. From Kentucky Burr proceeded to St. Louis, where he again met General Wilkinson. It was here, according to Wilkinson's own account, that he first began to suspect Burr "to be revolving some great project, the nature of which he did not disclose." He represents Burr as speaking contemptuously of "the imbecility of the government," and saying "it would moulder to pieces, die a natural death," or words to that effect; adding "that the people of the Western country were ready for revolt." To this Wilkinson says he recollects replying, "that if he had not profited more by his journey he had better remained at Washington or Philadelphia. For surely, said I, my friend, no person was ever more mistaken! The Western people disaffected to the government? They are bigoted to Jefferson and democracy! and the conversation dropped." From this and other similar conversations, Wilkinson says he began to fear that Burr had conceived some dangerous and desperate enterprise. Nevertheless, he strove to promote his election to congress, writing a letter to General Harrison, then governor of the territory of Indiana, urgently soliciting his influence to secure his return to congress from that territory. Wilkinson alleges, however, that his great anxiety to secure the election of Burr to congress arose from his fear that he was about to embark in some dangerous enterprise, which his election to congress might induce him to abandon. In the month of October Burr left the West to return to the Eastern states. On his way he called at Blennerhassett's island, but found neither the master nor the mistress at home. He proceeded to Washington, where he was received by the principal officials with due courtesy. He dined with the president, and conversed freely with members of the cabinet, from whom he learned that there would be no war with Spain. From Washington he went South to meet his son-in-law, Mr. Alston, and his daughter, Theodosia, returning in December to Philadelphia. He made this city his headquarters until he started West the following summer, living, it is said, in a style and situation more obscure than was formerly his custom. "He sought the society of men who had cause to be dissatisfied with the government, such as Commodore Truxton, who had been struck from the navy list, and General Eaton, who could not get his claim against the government paid. To these men, as to others, he spoke in contemptuous terms of the administration; he said a separation of the Western states must come sooner or later; he unfolded his plans and urged them to unite their fortunes with his. Parton's Life of Burr.

From Philadelphia, in the month of December, Burr wrote his first letter to Blennerhassett. If, as has been said, it was "a very innocent communication," it was nevertheless a very artful one. After expressing his regret that the absence of Blennerhassett from home had deprived him of the pleasure of improving his personal acquaintance when visiting the island, he flatteringly alluded to his talents, as suited to a higher sphere than that in which they were then employed. He alluded to his gradually diminishing fortune, and the duty he owed to his children, who might be left destitute if he did not make some effort to add to his present estate. This letter produced the desired effect. Blennerhassett answered it, saying that he felt that the interests of a growing family would summon him again into active life, to the resumption of his former

to Burr only—Wilkinson shall dictate the rank and promotion of his officers. Burr will proceed westward 1st August, never to return: with him go his daughter—the husband will follow in October with a corps of worthies. Send forthwith an intelligent and confidential friend with whom Burr may confer. He shall return immediately with further interesting details—this is essential to concert and harmony of movement. Send a list of all persons known to Wilkinson west of the mountains, who could be useful, with a note delineating their characters. By your messenger send me four or five of the commissions of your officers, which you can borrow under any pretence you please. They shall be returned faithfully. Already are orders to the contractor given to forward six months' provisions to points Wilkinson may name—this shall not be used until the last moment, and then under proper injunctions: the project is brought to the point so long desired: Burr guarantees the result with his life and honor—the lives, the honor and fortunes of hundreds, the best blood of our country. Burr's plan of operations is to move down rapidly from the falls on the 15th of November, with the first five hundred or one thousand men, in light boats now constructing for that purpose—to be at Natchez between the 5th and 15th of December—then to meet Wilkinson—then to determine whether it will be expedient in the first instance to seize on or pass by Baton Rouge. On receipt of this send Burr an answer—draw on Burr for all expenses, &c. The people of the country to which we are going are prepared to receive us—their agents now with Burr say that if we will protect their religion, and will not subject them to a foreign power, that in three weeks all will be settled. The gods invite to glory and fortune—it remains to be seen whether we deserve the boon. The bearer of this goes express to you—he will hand a formal letter of introduction to you from Burr, a copy of which is hereunto subjoined. He is a man of inviolable honor and perfect discretion—formed to execute rather than project—capable of relating facts with fidelity, and incapable of relating them otherwise. He is thoroughly informed of the plans and intentions of Burr, and will disclose to you as far as you inquire, and no further—he has imbibed a reverence for your character, and may be embarrassed in your presence—put him at ease and he will satisfy you—29th July."

Burr had entrusted to Dr. Bollman another copy of the same letter, in cipher, to be delivered to Wilkinson in New Orleans. After a journey of nine weeks Swartwout reached the headquarters of General Wilkinson, at Nachitoches, his companion having previously separated from him and pursued his journey to New Orleans. Swartwout inquired for Colonel Cushing, who was second in command, and was at Wilkinson's headquarters. To Colonel Cushing he presented a letter from Jonathan Dayton, introducing Ogden to his acquaintance, but mentioning Swartwout as Ogden's traveling companion. Colonel Cushing introduced Swartwout to Wilkinson as the friend of Dayton. Swartwout observed that Mr. Ogden and himself, being on their way to New Orleans, had learned at Fort Adams that our troops and some militia were assembling at Nachitoches, whence they were to march against the Spanish army, then in the neighborhood, and that the object of his visit was to act with them as a volunteer. While Colonel Cushing was temporarily absent from the room, Swartwout delivered to Wilkinson the packet of which he was the bearer, containing the ciphered letter hereinbefore mentioned, and a letter from Jonathan Dayton, (also in cipher,) of which the following is a copy: "Dear Sir: It is now well ascertained that you are to be displaced next session. Jefferson will affect to yield reluctantly to public sentiment, but yield he will. Prepare yourself, therefore, for it. You know the rest. You are not a man to despair, or even despond, especially when such prospects offer in another

quarter. Are you ready? Are your numerous associates ready? Wealth and glory, Louisiana and Mexico! I shall have time to receive a letter from you before I set out for Ohio. Ohio. Address me here, and another in Cincinnati. Receive and treat my nephew (Ogden) affectionately, as you would receive your friend, Dayton."

Wilkinson, according to his own account, on reading these letters, immediately determined to draw from Swartwout all the information he could in relation to Burr's plans. Swartwout remained ten days at headquarters, in the course of which time Wilkinson testifies that he obtained from him the following statements: That he had been despatched by Col. Burr from Philadelphia; that he had passed through the states of Ohio and Kentucky, had proceeded from Louisville to St. Louis, where he expected to find him, (Wilkinson,) but learning that he had descended the river, had procured a skiff, hired hands, and followed him down to Fort Adams, and thence to Nachitoches, under a pretence of a disposition to take part in the campaign against the Spaniards, then depending. "That Colonel Burr, with the support of a powerful association extending from New York to New Orleans, was levying an armed body of seven thousand men, with a view to carry an expedition against the Mexican provinces, and five hundred men under Colonel Swartwout and a Colonel or Major Tyler were to descend the Alleghany, for whose accommodation light boats had been built and were ready." In answer to an inquiry by General Wilkinson, he said: "This territory would be revolutionized, where the people were ready to join them, and there would be some seizing, he supposed, at New Orleans—that they expected to be ready to march about the first of February, and intended to land at Vera Cruz, and march from thence to Mexico." Wilkinson remarked that there were several millions of dollars in bank in New Orleans, to which Swartwout replied, "We know it full well." Wilkinson then observed, they certainly did not mean to violate private property; to which S. replied, "They merely meant to borrow, and would return it; that they must equip themselves in New Orleans; that they expected naval protection from Great Britain—that Captain —— and the officers of our navy were so disgusted with our government that they were ready to join—that similar disgust prevailed throughout the Western country, where the people were zealous in favor of the enterprise, and that pilot-built schooners were contracted for along our Southern coast—that he had been accompanied from the falls of the Ohio to Kaskaskias, and from thence to Fort Adams, by a Mr. Ogden, who had proceeded to New Orleans, with letters from Col. Burr to his friends there."

Whether Wilkinson, up to this time, had been as ignorant of Burr's plans as he subsequently professed to have been, and was moved by patriotic motives only to oppose them, or whether he had made up his mind that it would be more profitable to himself to betray his confederate than to betray his country, is a question about which those who examine the evidence on the subject will, perhaps, always differ in opinion. It is difficult to believe, however, that Burr could have been so fatally stupid as to send such a communication to a man whom he had not the strongest reason to regard as fully committed to his projects. However this may be, Wilkinson soon determined to take active measures for opposing and breaking up the expedition. Having taken this resolution, he hastened to make such terms with the Spanish commander on the Sabine as would obviate the hostilities which had been expected, and justify him in transferring the principal portion of his troops to the Mississippi. He sent forward an officer to put the city of New Orleans in the best possible condition for defence, and he sent a special messenger to Washington with despatches for the president. The messenger reached Washington on the 25th of November, and on the 27th President Jefferson

issued a proclamation, setting forth that unlawful enterprises were on foot in the Western states, having for their object a military expedition against the dominions of Spain; that for this purpose sundry citizens of the United States were fitting out and arming vessels in the Western waters, collecting provisions, arms, and military stores, and seducing honest and well meaning citizens, under various pretences, to participate in said criminal enterprises; warning all persons engaged therein to "withdraw from the same without delay," "as they will answer the same at their peril, and incur prosecution with all the rigors of the law;" and commanding all officers, civil and military, to use their utmost exertions to bring the offending persons to punishment. The name of Burr was not mentioned in the proclamation.

On the 25th of November Gen. Wilkinson arrived in New Orleans. Doctor Bollman (who had previously forwarded to him, at Nachitoches, the ciphered letter entrusted to his care) called upon him the next day after his arrival. They had some conversation about Burr's plans. Wilkinson permitting Bollman to remain under the impression that he was connected with them. On the 5th of January, 1807, Wilkinson called on Bollman, and (the mail having arrived the day before) inquired whether he had received any intelligence from Burr. Bollman replied that he had received a letter from him of the 30th of October, in which he gave assurances that he should be in Natchez with 2,000 men on the 20th of December, where he should wait until he heard from New Orleans; that he would be followed by 4,000 men more, and if he had chosen could have raised 12,000 as easily as 6,000, but did not think that number necessary. Wilkinson then threw off his disguise, and told Bollman he should certainly oppose Burr, if he came that way. On receiving this information, Wilkinson appears to have become greatly alarmed. At all events, he succeeded in getting up a prodigious excitement in New Orleans. Martial law was proclaimed; public meetings were held, and harangued by Wilkinson and by Governor Claiborn. Volunteer troops offered their services, new defences were erected, and a detachment of troops was stationed above the city, with orders to stop and overhaul every descending boat. A secret session of the legislature was held; Governor Claiborn issued a proclamation; the alarm spread, and proclamations were issued by the governors of neighboring territories. The Spanish authorities became equally alarmed, and began to strengthen the defences of Mexico. On affidavits made by Gen. Wilkinson, Swartwout, Bollman, Ogden, and General Adair were arrested and immediately shipped to Baltimore. Bollman and Swartwout, on reaching Baltimore, were, by orders of the president, brought to Washington. They were taken before the circuit court of the district of Columbia, and upon the affidavits of General Wilkinson and General Eaton, and a few other unimportant affidavits forwarded by Wilkinson from New Orleans, were committed for treason. The supreme court of the United States being then in session, an application was made to it for a writ of habeas corpus. After full argument of the question whether that court had the power to issue the writ of habeas corpus ad subjiciendum, in case of a commitment by a circuit court, the writ was granted. On the return of the writ by the marshal of the district, showing that he detained the prisoners by virtue of a commitment issued by said circuit court, Mr. Lee, counsel for the prisoners, moved their discharge. As all the evidence before the circuit court was in the form of affidavits, the record brought up all the facts. The case was elaborately argued for three days, by Cæsar Rodney, attorney general of the United States, and Walter Jones, United States attorney for the District of Columbia, on behalf of the United States, and by Charles Lee, F. S. Key, and Harper, for the prisoners. Chief Justice Marshall then delivered the opinion of

the court which was so often referred to on the trial of Col. Burr, and which is appended hereto. The prisoners were discharged.

To go back with our narrative: In the latter part of October, 1806, the president sent a confidential agent, named Graham, to the West, "with instructions to investigate the plots going on, to enter into conferences with the governors, and all other officers, civil and military, and with their aid to do on the spot whatever should be necessary to discover the designs of the conspirators, arrest their means, bring their persons to punishment, and to call out the force of the country to suppress any unlawful enterprise in which it should be found they were engaged." Graham arrived at Marietta about the middle of November. He was at this time chief clerk of the state department, but had previously been secretary of the territory of Orleans. Blennerhassett had received the impression from Burr that Graham was one of the friends in New Orleans upon whom he relied, and when he met him at Marietta, believing him to be a confederate, disclosed to him important facts touching Burr's plans and proceedings. Graham finally undeceived him as to his own relations to Burr, and believing him to be the victim of a cruel deception, endeavored to dissuade him from further connection with the enterprise, but all to no effect. The situation of things at Marietta and the island having been asertained by Graham, he proceeded to Chillicothe, where the legislature of Ohio was then sitting, and had an interview with the governor (Tiffin). The governor communicated with the legislature, and that body, sitting with closed doors, promptly passed an act to suppress the expedition. Under the authority of this act, the governor ordered out the militia of the vicinity, under the command of the major general of the district, to whom he gave instructions to seize the boats which had been built on the Muskingum, the stores which had been collected at Marietta, and all boats of a suspicious character descending the river.

Comfort Tyler and Ireal Smith, with four boats and about thirty men, arrived at the island, from Beaver, Pennsylvania, on the evening of the 7th of December. Of the fifteen boats contracted for on the Muskingum, eleven had been completed, and were to be delivered on the Ohio on the 10th of December. On the 9th, however, they were seized by the militia, with the provisions which had been purchased and stored at Marietta. Nearly all the recruits who had been engaged in that vicinity had abandoned the expedition. They had agreed to join it under the belief that there was nothing unlawful, or at least nothing criminal in it. Although they had been given vaguely to understand that they might be required to fight the Spaniards, either in Mexico or nearer home, they had been led to believe that this would only be required of them in case of a war with Spain, then confidently anticipated by them. The impression had been made upon their minds that the expedition, if not having the express sanction of the general government, was at least connived at by the administration. The visit of Graham, the objects of which soon began to leak out, rumors of the secret proceedings of the Ohio legislature, and of the president's proclamation, in advance of its arrival, had opened their eyes. They had no idea of adhering to a cause thus denounced as unlawful and criminal. Public excitement against the adventurers began to run high on both sides of the river, and Blennerhassett, finding himself abandoned by nearly all of those whom he had enlisted in the enterprise, began to despond and to waver, and would probably have abandoned it himself, but for the influence of his wife, who was a woman of superior energy. She met all the difficulties of the situation with a spirit that never quailed, and a resolution that never relaxed.

About the time of Tyler's arrival, the Wood county (Virginia) militia were being assembled to oppose the expedition. On the same day that the boats on the Muskingum were seized, the

party on the island received information that the Wood county militia was to make a descent upon them the following day. Hurried preparations were therefore made for leaving that night. It was arranged that Mrs. Blennerhassett, with her children, should remain on the island until she could obtain from Marietta a boat which had been fitted up for the special accommodation of the family. She was then to follow, with the personal effects which had been left in her care. Accordingly, a few trunks and boxes were carried on board the boats, and about midnight the little flotilla, consisting of the four boats brought down by Tyler, and one small boat added by Blennerhassett, cut loose from the shore and floated off. The next morning the militia arrived on the island, to find that the game had flown. The colonel left a small party in charge, and marched across the great "bend" of the river between the island and the mouth of the Great Kanawha, to intercept the boats at that point. The distance across, by land, being but little more than half the distance round by the river, this was an easy task. He stationed a company on the bank of the river, with strict injunctions to watch all night; but King Alcohol got the better of duty and discipline, the watchers all got gloriously drunk, and the flotilla glided by them in the darkness of the night, and pursued its voyage unchallenged. With like impunity it passed safely all the towns and villages below, although orders had been sent to all of them to arrest its progress. During the absence of the colonel on this expedition, a boat from Pittsburg touched at the mouth of the Little Kanawha, about two miles above the island, having on board fourteen young gentlemen, on their way to join the expedition among whom were Morgan Neville and William Robinson, Jr., names which have since become widely and honorably known. They were all arrested by the militia, as accomplices of Burr, and taken to the island. Three Wood county justices were sent for, and an examination was had before them, in which the prisoners, all young gentlemen of education, outwitted their accusers and the country justices, and were discharged. While this examination was going on, (Mrs. Blennerhassett being absent, at Marietta, in a fruitless endeavor to get possession of the "family boat,") a wild spirit of license and riot broke out among the militiamen at the mansion house. "First of all, the men broke into the wine-cellar, and there drank themselves into vandals. Then they ranged the house, destroying or disfiguring wherever they went; firing rifle balls through painted ceilings, tearing down costly drapery, and dashing to pieces mirrors and vases. (In 1811, the house, being built of wood, was entirely consumed by an accidental fire.) Then they rushed, like so many savages, about the grounds, destroying the shrubbery, and breaking down trellises and arbors. The ornamental fences were torn away, piecemeal, to make fires for the sentinels at night." Parton. In the midst of this riot and destruction, Mrs Blennerhassett returned, without her "family boat," the same having been denied her by the authorities. In this dilemma, the party of young men who had just been released, and were preparing to resume their journey, offered her an apartment in their boat, which she accepted, and, on the 17th of December, left her island home in possession of the rioters who had laid it desolate.

On the acquittal of Burr by the grand jury, at Frankfort, he hastened to Nashville. Graham also hastened to the same place, after rousing Ohio and Kentucky, and learning that boats for the expedition were being fitted out on the Cumberland. "An express with the president's proclamation reached the governor of Tennessee on the 19th, and preparations were immediately made for the seizure of the boats and the arrest of the men. But timely information was conveyed to Burr, and on the 22d, with two boats and a few men, armed only according to the custom of the country, he dropped down the Cumberland. The next day Graham arrived at

Nashville, to find the 'conspirators' beyond his reach." At the falls of the Ohio, the party under Tyler was joined by Floyd, with three boats, and a number of men. At the mouth of the Cumberland all the different detachments met—eleven boats, with about sixty men. Here the men were drawn up in a circle on the bank of the river, and Colonel Burr addressed them briefly. He told them he had intended here to explain his designs, or his plans, but circumstances had rendered it necessary to defer doing so for the present. Here, also, Burr purchased a trading boat of one Ellis, with its cargo, consisting of "bar-iron, hoes, mattocks, and a few barrels of apples."

The principal incidents of the expedition from this point until it was broken up are thus briefly sketched by Parton: "Ignorant of Wilkinson's treachery, away went Burr with his flotilla down the Ohio, down the Mississippi, stopping boldly at forts on the banks, asking and receiving favors, and occasionally picking up a recruit or two. He wore a smiling face, and reassured every one by the cheerful serenity of his bearing. It was not until he reached Bayou Pierre, about thirty miles above Natchez, that he heard of the course which had been pursued by Wilkinson, and of the prodigious excitement which his measures had created in the lower country. There, too, he read the proclamation of the governor of Mississippi, charging him and his followers with being conspirators against their country, and calling on the officers of the government to renew their oath of fidelity to the United States, and give their best efforts towards crushing the nefarious plot. Whatever his feelings may have been at the discovery, Col. Burr never for one moment lost his self-possession, but proceeded on the very instant to grapple with this new complication of difficulties. He wrote a public letter denying the truth of the governor's allegations, and asserting that he had no objects but such as were lawful and honorable. 'If,' said he, 'the alarm which has been excited should not be appeased by this declaration, I invite my fellow citizens to visit me at this place, and to receive from me, in person, such further explanations as may be necessary to their satisfaction, presuming that when my views are understood, they will receive the countenance of all good men.' This letter he requested might be read to the militia, who were assembled for his arrest. But the excitement had risen to a height which could not be allayed by fine words. The news of Burr's arrival at Bayou Pierre reached Natchez on the 14th of January, when the whole militia force of the neighborhood, who had been for weeks expecting the summons, seized their arms and hurried to the rendezvous. In a few hours two hundred and seventy-five men were ready to embark. All one cold and dismal night they worked their way up the river to a point near where the dread flotilla was moored. There disembarking, they were soon joined by a troop of cavalry, and were soon in readiness to march against the foe. It was thought best, however, first to ascertain if Col. Burr was disposed to resist their formidable array, or would surrender peacefully to the lawful authorities. For this purpose, George Poindexter, the attorney general of the territory, and Major Shields, of the militia, visited the flotilla, and had an interview with its commander. A letter from the acting governor was handed to Burr, who read it, and spoke with some contempt of the public alarm to which it alluded 'As to any projects,' said he, 'which may have been formed between General Wilkinson and myself, heretofore, they are now completely frustrated by the perfidious conduct of Wilkinson, and the world must pronounce him a perfidious villain. If I am sacrificed, my portfolio will prove him to be such.' He declared that so far was he from having any design hostile to the United States, he had intended to meet the governor at the general muster at Bayou Pierre. Upon the attorney general's urging him to surrender, he demanded an interview with the

governor. After some further colloquy, the parties separated, Burr agreeing to meet Governor Mead on the following day at a designated house near by. The governor came at the time appointed, and, after meeting Burr, demanded his unconditional surrender, and that of his whole party, to the civil authorities, and gave him fifteen minutes to decide. Resistance being out of the question, Burr only requested that if Wilkinson should attempt to get possession of his person by a military force, it might be resisted. He then surrendered, and was conducted to the neighboring town of Washington, where two citizens became sureties for his appearance at court on the following day, in the sum of ten thousand dollars. His men remained in the vicinity of the flotilla. A court of justice was to Aaron Burr what his native heath was to MacGregor. On that field he was invincible. It was only after warm discussions that it was concluded that he could be lawfully tried in the territory. The next step was to get him indicted for some offence. A grand jury was impanneled, and witnesses sent to them. Imagine the feelings of the attorney general when he read the result of all his toils in the following presentments:

" 'The grand jury of the Mississippi territory, on a due investigation of the evidence brought before them, are of opinion that Aaron Burr has not been guilty of any crime or misdemeanor against the laws of the United States or of this territory, or given any just cause of alarm or inquietude to the good people of the same. The grand jurors present, as a grievance, the late military expedition, unnecessarily, as they conceive, fitted out against the person and property of the said Aaron Burr, when no resistance had been made to the civil authorities. The grand jurors also present, as a grievance destructive of personal liberty, the late military arrests, made without warrant, and, as they conceive, without other lawful authority; and they do sincerely regret that so much cause has been given to the enemies of our glorious constitution to rejoice at such measures being adopted, in a neighboring territory, as, if sanctioned by the executive of our country, must sap the vitals of our political existence, and crumble this glorious fabric in the dust.'

"It was of no avail for the attorney general to declare that such presentments were a disgrace and an outrage, nor for the judge to pronounce them impertinent and useless. The people were with the prisoner. Nothing approaching or resembling a breach of the law had been committed by him; and, in short, the grand jury had made up its mind, and would not recede from its position. His companions were at perfect liberty. A Natchez newspaper of the time, commenting on this attempt to indict, says that 'Burr and his men were caressed by a number of the wealthy merchants and planters of Adams county; several balls were given to them as marks of respect and confidence.' Also, 'that the proceedings against the accused were more like a mock trial than a criminal prosecution, and that, during the trial, Judge Bruin appeared more like his advocate than his impartial judge.' All of which is extremely probable. Having, as he thought, fully complied with his recognizances, Colonel Burr demanded a legal release from the court. This was refused. Learning that farther and more arbitrary proceedings were intended against him by the government officials, and perceiving the utter hopelessness of attempting to proceed, and that his presence must embarrass, but could not assist his band, he resolved to fly. Disguising himself in the dress of a boatman, he crossed to the eastern side of the Mississippi, and disappeared in the wilderness. At the meeting of the court on the following morning, he, of course, did not present himself, and there was a great show of surprise. The governor, who, it was said, had connived at his escape, promptly offered two thousand dollars for his arrest. Two or three days passed without any tidings of the fugitive, though the surrounding country was

scoured by parties in search. At length, a colored boy was seen, riding one of Burr's horses, and wearing an overcoat that had been his. He was seized forthwith, and thoroughly searched. Sewed in the cape of the coat was found a note addressed to 'C. T. and D. F.,' (Comfort Tyler and Davis Floyd,) which read as follows: 'If you are yet together, keep so, and I will join you tomorrow night. In the mean while, put all your arms in perfect order. Ask no questions of the bearer, but tell him all you may think I wish to know. He does not know that this is from me, nor where I am.' In consequence of this discovery, Burr's men were arrested and placed under guard, and kept as prisoners until the alarm was over. But no further trace of the chief was seen in the neighborhood. He had left the vicinity, and was making his way through a dismal wilderness, towards the port of Pensacola, where lay a British man-of-war, in which he hoped to find a temporary refuge."

Blennerhassett, after his discharge from custody, located his family in Natchez, and, in June following, left that place on horseback to return to his island, and look after his affairs in that vicinity. When he reached Lexington, Kentucky, he was there arrested for treason, and conveyed thence, under a guard, to Richmond. "Others of Burr's confederates, who had the means, returned to the Eastern states, and forgot the dream of glory in the pursuit of civil life. A large number of the band remained in the territory, supplying it, as the attorney general afterwards remarked, with a superfluity of school-masters, music-masters and dancing-masters, for many years. The narrative of these events, published in all the newspapers of the land, drew public attention to the southwestern territories of the Union, and attracted (says Dr. Monette, the historian of the Valley of the Mississippi) thousands of emigrants thither from the Atlantic and Western states."

### The Counsel Engaged in the Trial of Colonel Burr.

Seldom has such an array of eminent counsel appeared together in any one case as participated in the great trial which constitutes the subject-matter of this volume.

The leader of the prosecution was George Hay, attorney of the United States for the district of Virginia; a man of fair ability, but hardly equal to the task imposed upon him. He was the son-in-law of Colonel Monroe (afterwards president of the United States), and a zealous Democrat of the Jefferson school. He prosecuted the case with zeal, it is true, but the charge that he displayed an "intemperate zeal" (sometimes plainly intimated by counsel on the other side) does not appear to be justified by the reports of the trial.

Mr. Hay was ably assisted by William Wirt, then thirty-five years of age, and just rising into eminence. No other lawyer in the case, on either side, so commanded the attention and won the admiration of the throng of spectators who attended the trial, as he. While his handsome person, graceful manners, pleasing wit, and brilliant declamation invariably captivated the bystanders, there was always solid matter enough in his arguments to attract the heaviest guns of his adversaries. It is said that he engaged in the prosecution at the personal request of President Jefferson.

The prosecution was also assisted by Alexander MacRae, "the son of a Scotch parson, who was distinguished in the Revolutionary war, first, for being himself a hot Tory, and, secondly, for being the father of seven sons, all of whom were ardent Whigs." He is described by Parton as "a lawyer of respectable ability and a sharp tongue—sharp from ill-nature more than wit." He was neither pleasing nor powerful in argument. At the time of the trial he was lieutenant governor of Virginia.

On the part of the defence, the real leader and principal tactitian was Burr himself. "No step

was taken" (says Parton), "not a point conceded, without his express permission. He appeared in court attired with scrupulous neatness, in black, with powdered hair and queue. His manner was dignity itself—composed, polite, confident, impressive. He had the air of a man at perfect peace with himself, and simply intent on the business of the scene. It was observed that he never laughed at the jokes of counsel, which, at some stages of the trial, were numerous and good." He never lost his temper, and never, under any provocation, was betrayed into an offensive personal retort. He brought forward nearly every motion made on his side, and stated the grounds of it with remarkable brevity and clearness. He was equally happy in briefly summing up, at the close of a debate, and presenting in perspicuous order the strong points brought forward in the more elaborate arguments of his counsel. He never, in the whole course of the trial, indulged in an argument of any considerable length. Deep, abstruse, metaphysical reasoning was not his fort. He left all that to more competent hands.

Edmund Randolph, in point of age, experience, and position, deserves to be mentioned first, of the counsel who assisted in the defense. He was a dignified Virginia gentleman of the old school. He had been a member of the continental congress during the Revolution, attorney general and secretary of state under Washington, and governor and attorney general of his own state. He was a man of much learning and fair ability; but his powers were then rather on the wane.

Second among Burr's counsel should be ranked John Wickham, of Richmond, in whom was combined, more than in any one else engaged in this trial, on either side, all the elements which constitute the able and accomplished barrister. He was an Englishman by birth, and "had learning, logic, wit, sarcasm, eloquence, a fine presence, and persuasive manner."

Next should be mentioned Luther Martin, of Maryland, "who (says Parton), in the single particular of legal learning, was the first lawyer of his day. His memory was as wonderful as his reading, so that his acquirements were at instantaneous command. Burr had become acquainted with him at Washington three years before, during the trial of Judge Chase, in whose defence he greatly distinguished himself." He was coarse in his manners, ungrammatical in his language, verbose and addicted to repetitions in his style, and utterly regardless of order in the arrangement of his arguments. These defects were aggravated by an unfortunate impediment in his speech, arising from an excessive flow of saliva. Withal, he was "a mighty drinker," and though able to carry an incredible cargo of brandy, often exhibited unmistakable signs of being over-laden. Blennerhassett says of him, in his journal: "Fancy has been as much denied to his mind as grace to his person or habits. These are gross and incapable of restraint, even on the most solemn public occasions. Hence his invectives are rather coarse than pointed, his eulogiums more fulsome than pathetic." Nevertheless, he was a great and powerful man, possessing many excellent qualities of the heart as well as of the head. He entered upon the defence of Colonel Burr with all the zeal that the warmest personal friendship for his client, and intense political enmity to Jefferson and his administration, could inspire in his ardent and passionate nature.

Benjamin Botts, father of John Minor Botts, of the present generation, was another distinguished lawyer who took a prominent part in conducting the defence. He was the youngest of Burr's counsel: a ready, bold, dashing man, who always charged his adversary on the "double quick," and generally dealt effective blows. He had great power of caricaturing the arguments of his opponent, and exposing them in a ludicrous light.

Charles Lee appeared, also, as counsel for Burr at an advanced stage of the trial. He was one of the most distinguished lawyers of Virginia, had at one time been attorney general of the United States, and had been counsel for Bollman and Swartwout, before the supreme court. He did not take a very active part in the trial, but the few brief addresses he made to the court were models of terse, vigorous, and compact argument.

Last, and least, was "a certain Jack Baker," who has been described as "a lame man, with a crutch; a merry fellow with plenty of 'horse wit' and an infectious laugh; no speaker and no lawyer, but the best of good fellows." He just took part enough in the trial to get his name once or twice in the reports, and thereby save it from oblivion.

It is stated in Blennerhassett's journal that all these distinguished lawyers tendered their services gratuitously to Colonel Burr. Mr. Wickham and Mr. Botts made a similar tender of their services to Blennerhassett.